# IN RE MARIAH S.*
## (AC 20365)

Spear, Pellegrino and Hennessy, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 26—officially released December 26, 2000

*Raymond J. Rigat*, for the appellant (respondent mother).

*Mary K. Lenehan*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

SPEAR, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights with respect to her minor child, M.[1] She claims that the court improperly found that (1) the department of children and families (department) made reasonable efforts at reunification, (2) she failed to achieve a sufficient level of personal rehabilitation and (3) there was no ongoing parent-child relationship. The respondent further claims that her federal and state constitutional

---

[1] The trial court terminated the parental rights of both parents, but only the respondent mother has appealed from the judgment.

rights were violated because (1) the department's efforts at reunification were not reasonable and were especially inadequate considering that the respondent was a dependent child herself, (2) the court improperly concluded that there was no ongoing parent-child relationship prior to finding that the respondent was an unfit parent and (3) counsel for the respondent rendered ineffective assistance. We affirm the judgment of the trial court.

The court found the following facts. J., a twenty-six year old man, impregnated the respondent when she was twelve. At the time, the respondent, a former foster child, lived in Danbury with her maternal grandmother and two of her grandmother's adult children. M was born on September 4, 1995, when the respondent was thirteen years old.

The respondent initially feared the department due to her own mother's experience in having children removed from her care, but she reluctantly agreed to accept assistance from the intensive family preservation service. The respondent nonetheless made poor caretaking choices for her child. A social worker who repeatedly visited the respondent's home for three months following the child's birth found that the child was not there, that the respondent did not know the name of the child's baby-sitter, that the child remained in the baby-sitter's care for several days at a time or that neither the respondent nor the child was at home and their whereabouts were unknown. In December, 1995, the respondent told the social worker that she was overwhelmed with caring for her child and wished to have the child cared for by a friend.

On January 11, 1996, the commissioner of children and families (commissioner) filed a neglect petition on behalf of the child. Later that month, a social worker visited a home in New Milford where the respondent

had placed her child three weeks earlier. After the police arrested an adult male occupant of the New Milford home for a drug-related offense, the child was removed from the home and a ninety-six hour hold was invoked. On March 1, 1996, the court issued an order of temporary custody, finding that the child was in immediate physical danger from her surroundings and that removal was necessary to ensure her safety. The child was then placed in the care of a foster family, where she has been living ever since.

During the ensuing year, David Mantell, a psychologist, conducted a court-ordered evaluation of the respondent and recommended mental health care, a psychiatric evaluation for assessment of depression and medication, and an intensive program of individual psychotherapy. Because the respondent did not follow Mantell's recommendations and made little progress toward reunification, the department took additional steps. On April 10, 1997, the respondent entered into a service agreement with her grandmother and the department that outlined the parties' various responsibilities "in creating conditions that would allow [the respondent] to be considered as a permanent caretaker for [the child] . . . ." The respondent agreed to visit her daughter, to participate in psychotherapy and to show improvement in her "judgment, relationships with men, self-esteem and parenting issues." She also agreed to participate in a psychiatric evaluation and to inform the department if any of the anticipated service providers were unavailable so that the department could offer alternative resources. In addition, the respondent agreed to review her progress in six months.

The respondent did not live up to her obligations. She refused to complete a psychiatric evaluation and to participate in psychotherapy. On March 18, 1998, the court adjudicated the child neglected, following the respondent's nolo contendere plea, and committed the

child to the care and custody of the commissioner for a period not to exceed twelve months.

On March 18, 1998, the respondent, her attorney, her court-appointed guardian ad litem and the child's attorney agreed to court-ordered expectations whereby the respondent was required, inter alia, (1) to keep all appointments set by or with the department, (2) to make her whereabouts known, (3) to visit the child as often as the department permitted, (4) to engage in individual counseling, (5) to secure and maintain adequate housing and income, (6) to abstain from substance abuse, (7) to obtain a consistent secondary caretaker, (8) to have no "involvement" with the criminal justice system, (9) to participate in a teen mentor program and (10) to complete a psychological evaluation and follow any subsequent recommendations for treatment. The expectations included a caveat advising the respondent that the "[f]ailure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or [department] worker."

On March 9, 1999, the commissioner filed a petition to terminate the respondent's parental rights. A trial was conducted in October, 1999. The court found by clear and convincing evidence that the department had made reasonable efforts at reunification. The court also found by clear and convincing evidence that the respondent had failed to achieve sufficient personal rehabilitation, within the meaning of General Statutes § 17a-112 (c) (3) (B),[2] as would encourage the belief that within

[2] General Statutes § 17a-112 (c) provides in relevant part: "The Superior Court, upon hearing and notice . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that . . . (B) the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, or (2) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific

a reasonable time, considering the age and needs of the child, she could assume a responsible position in the child's life. The court further found that the respondent did not have an ongoing parent-child relationship with the child, within the meaning of § 17a-112 (c) (3) (D),[3] and concluded that termination of the respondent's parental rights was in the child's best interest. This appeal followed.

At the outset, we note that "[t]he standard for review on appeal [in a termination of parental rights case] is whether the challenged findings are clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . . *In re Alissa N.*, 56 Conn. App. 203, 207, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000).

"Nonconsensual termination proceedings involve a two step process, an adjudicatory phase and a dispositional phase. See Practice Book § 33-1 et seq. In the

---

steps to take to facilitate the return of the child to the parent . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[3] General Statutes § 17a-112 (c) (3) (D) provides in relevant part that the Superior Court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. . . . *In re Alissa N.*, supra, 56 Conn. App. 207. In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment thereto. *In re Tabitha P.*, 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); see also Practice Book § 33-3 (a).[4] This limitation is inapplicable in the dispositional phase, in which the trial court can consider all events occurring prior to the date of the dispositional hearing, including those occurring after the filing of the termination petition. . . . *In re Kasheema L.*, 56 Conn. App. 484, 488, 744 A.2d 441, cert. denied, 252 Conn. 945, 747 A.2d 522 (2000)." (Internal quotation marks omitted.) *In re Shane P.*, 58 Conn. App. 234, 239–40, 753 A.2d 409 (2000). "The dispositional phase . . . also must be supported on the basis of clear and convincing evidence." *In re Alissa N.*, supra, 208.

I

The respondent first claims that the court improperly concluded that the department made reasonable efforts at reunification. We disagree.

Before the court may grant a petition to terminate parental rights on the ground of failure to rehabilitate, it must find by clear and convincing evidence that the department has made reasonable efforts to reunite the child with the parent. General Statutes § 17a-112 (c)

---

[4] Practice Book § 33-3 (a) provides in relevant part: "In the adjudicatory phase, the judicial authority is limited to events preceding the filing of the petition or the latest amendment." In this case, the petition was filed on March 9, 1999, but the court granted the petitioner's motion to amend the petition on September 15, 1999, in accordance with Practice Book § 35-1 (c). The operative date for purposes of defining the adjudicatory phase, therefore, is September 15, 1999.

(1).[5] Although "[n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Savanna M.*, 55 Conn. App. 807, 812–13, 740 A.2d 484 (1999).

The following additional facts are relevant to our resolution of this claim. In March, 1996, after the child was removed from the respondent's custody, the department immediately afforded the respondent visitation at the foster family's home in New Milford, the same town where she had placed the child in the care of her friends earlier that year. The department social worker explained the need for the respondent to keep her weekly appointments to visit the child, but, over time, the respondent's visits became infrequent and, for significant periods, nonexistent. Although the foster family lived thirty minutes from the respondent's home, the respondent made only thirty-one out of her fifty-one scheduled visits in 1997, and only ten out of her fifty-one scheduled visits in 1998.

In June, 1997, the social worker arranged to provide the respondent with weekly transportation to visit the child accompanied by her aunt or a social services assistant, but later that month the respondent reported that she did not need such transportation. In August, 1997, the respondent nonetheless canceled one of her scheduled visits for lack of available transportation. At that point, because the social services assistant was no longer available to provide her with transportation, the

---

[5] General Statutes § 17a-112 (c) (1) provides in relevant part that the Superior Court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that "the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ."

respondent's teen mentor transported her to the scheduled visits almost every week from August, 1997, to mid-January, 1998. After the mentor became a department employee and could not continue to transport the respondent, the social worker proposed that the respondent take the bus from Danbury to New Milford and offered to have a staff member accompany her initially to show her the route. Although the bus departed hourly and stopped within a seven or eight minute walk of the child's foster home, the respondent rejected the offer of assistance and refused to take public transportation.

After the March, 1998 neglect proceeding and the execution of expectations, the respondent's willingness to cooperate in visitation matters continued to decline. The social worker repeatedly attempted to contact the respondent by both telephone and by letter during the next several months to discuss her visitation obligations, but the respondent did not reply, despite having signed a return receipt for one of the letters in May, 1998. At that time, the department again offered transportation to the respondent, but when she finally contacted the social worker, transportation no longer was available.

Shortly thereafter, the social worker discussed with the respondent the possibility of terminating her parental rights. The department again addressed the respondent's visitation problems in its July, 1998 letter advising her that the child was being placed in a "legal risk adoptive home," and offered to set up a visitation schedule and to help the respondent obtain transportation. In December, 1998, a social worker met with the respondent and advised her that the commissioner planned to file an action to terminate her parental rights because she had not complied meaningfully with significant parts of the expectations. The social worker specifically noted that the respondent had visited her child only a few times from the time of commitment to the time of

the meeting, a period of approximately nine months. The respondent replied that she had been busy working and remained unwilling to take public transportation. Only in late January, 1999, did the respondent begin to visit her child on a regular basis.

The respondent also resisted a psychological evaluation and counseling, which the department considered to be critical to her reunification with the child. The department recommended psychotherapy to the respondent in June, 1996, after Mantell's evaluation, but the respondent flatly rejected psychotherapy. The department firmly believed that counseling was important to help the respondent to plan her life, to become a good parent and to develop better judgment. Although department social workers and the respondent's grandmother urged the respondent to participate in individual therapy, she continued to resist even after she agreed to counseling in the April, 1997 services agreement and the March, 1998 expectations. Not until January, 1999, almost two years later, did the respondent seek therapy.

We conclude that the court's finding that the department made reasonable efforts to reunite the respondent with her child within the meaning of § 17a-112 (c) (1) was legally correct and factually supported. We also agree with the court's finding that "[t]he evidence in this case is clear and convincing that [the department] made reasonable efforts to reunify [the respondent] with her child after the issuance of the [order of temporary custody] in March, 1996. The record reflects that [the department] offered or facilitated psychological evaluations, psychiatric evaluation, the teen mentor program, individual therapy, weekly visitation and transportation to visits. [The department] continued these efforts after the prompt and accurate psychological assessment of [the respondent] provided by [Mantell] in June, 1996. Although he recommended a

psychiatric evaluation and [the respondent] belatedly finally began it, she did not complete it or avail herself of the follow up counseling which was available to her. By her own admission, [the respondent] refused to cooperate over a period of years. . . . Counseling was recommended, then required. Apparently none of her advisors could convince her to go."

The respondent argues that it was unreasonable for the department to separate her from her child after the child's birth rather than placing them together in the same foster home, to leave her at age thirteen in the care of a guardian who "allowed" her to become pregnant at age twelve and to expect a fourteen or fifteen year old mother to ride the bus alone in an unfamiliar neighborhood for limited visits with her child. The respondent also argues that it was unreasonable for the department to provide her with court-ordered expectations that were more appropriate for an adult mother, to fail to address her special education needs, to allow the foster family to condition the child not to address the respondent as "mommy" and to limit her supervised visits to the home of the foster family instead of permitting lengthier, supervised visits at a neutral location.

We are not persuaded by these arguments. While placing a baby and its mother, who is still a child herself, in the same foster home might be advantageous in certain circumstances, the respondent in the present case demonstrated poor judgment and caretaking skills during the few months when she did have custody of her child. Moreover, the respondent told a department social worker that she was overwhelmed by her parenting responsibilities, expressed her wish to have a friend care for her child instead and, in the weeks immediately preceding revocation of custody, left her child in the full-time care of another family. Her argument that she should not have been allowed to remain with her grandmother after the baby's birth is irrelevant to the issue

of reunification because it bears no relation to the department's efforts to prepare her for parenthood. Moreover, we agree with the court's conclusions that "[t]he proposed bus trip to visit [the child] was not onerous or unreasonable. No meaningful evidence was offered to show that it was unsafe or that any incident of harassment occurred when she did visit or when she took [the child] out with her mentor. Most significant, [the respondent] herself admitted at trial that if she had known where the bus stopped, she would have taken it. Unfortunately, her own oppositionality prevented her from acquiring that knowledge."

The court also noted in its memorandum of decision that the respondent's "effort to challenge the amount, location and transportation arrangements surrounding visitation is belated. Testimony showed that [the respondent] attended only three of the eight treatment reviews which were held by [the department] every six months concerning [the child]. She was represented by counsel, and had a guardian ad litem and a legal guardian from the inception of this matter in 1996. If the plans developed for [the child], including visitation, had been unsatisfactory, they could have been challenged and relief sought in the administrative process before [the department] and then in court. No such challenges were mounted."

We are similarly unpersuaded by the respondent's remaining arguments. Contrary to her assertion, the expectations did contain provisions addressing the respondent's age-related needs. Those provisions included the assignment of a teen mentor and the requirement that the respondent participate in a complete psychological evaluation and follow any subsequent recommendations for treatment, which presumably would have addressed her special needs as a teenage parent. Furthermore, both the respondent and her grandmother agreed to the expectations. As

for the respondent's educational needs, the department expressed concern that the respondent did not attend school regularly and resisted individual psychotherapy, which would have helped her develop the skills and insight required to become more self-reliant and a good parent. We also are unaware of any evidence to support the allegation that the foster family conditioned the child not to call the respondent "mommy." Finally, the respondent points to no evidence to support her claims that her supervised visits at the foster home were detrimental to her relationship with her child or that the department did not allow her to visit with her child outside the foster home. Indeed, the court found that the respondent and her teen mentor took the child out of the foster home during many of their visits.

"Reasonable efforts" contemplates everything reasonable, not all things possible. Id. The department cannot be blamed for the fact that the respondent became a "stranger" to her child, as noted by the court, because of her own unwillingness to take advantage of the many opportunities that the department provided to help her develop parenting skills and to bond with her child. We conclude that the court properly found, by clear and convincing evidence, that the department made reasonable, albeit unsuccessful, efforts at reunification.

II

The respondent next claims that the court improperly terminated her parental rights on the ground of failure to achieve personal rehabilitation. We do not agree.

Failure to achieve personal rehabilitation, one of six statutory grounds on which parental rights may be terminated pursuant to § 17a-112 (c) (3), is found when a parent of a child who has been found by the court to have been neglected fails to achieve such a degree of rehabilitation as would encourage the belief that, within

a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of the child.

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . Our Supreme Court has held that General Statutes (Rev. to 1989) § 17-43a (b) (2) [the predecessor to § 17a-112] requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." (Internal quotation marks omitted.) *In re Marvin M.*, 48 Conn. App. 563, 578, 711 A.2d 756, cert. denied, 245 Conn. 916, 719 A.2d 900 (1998). "What is a reasonable time is a factual determination that must be made on a case-by-case basis." *In re Michael L.*, 56 Conn. App. 688, 694, 745 A.2d 847 (2000). "The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find . . . that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999). The critical issue is whether the parent "has gained the ability to care for the particular needs of the child at issue." *In re Danuael D.*, 51 Conn. App. 829, 840, 724 A.2d 546 (1999).

The following additional facts from the court's memorandum of decision are relevant to our resolution of this claim. The department requested that Diana Martinez, a psychologist, observe interactions between the respondent and the child on three separate occasions in March

and August, 1999, after learning that the child was distressed and withdrawn following the respondent's visits. A January, 1999 visit with the respondent and her grandmother caused the child particular distress. The visit followed a lengthy period of infrequent visitation, and, during the January visit, the respondent and her grandmother informed the child that she would be living with them.

Martinez first observed the respondent with her daughter in March, 1999, at the foster family's home. She noted that the respondent was passive and interacted "minimally" with the child, did not demonstrate active caretaking behavior or even an interest in her child and did "not know how to engage, stimulate [the child's] active imagination or recognize the value of interacting with [the child] to promote the relationship." At trial, Martinez also testified that the respondent did not bring activities that were age-appropriate for the child or know how to "proactively meet the child where she was at." The child herself resisted calling the respondent by name and even avoided talking to her. She appeared, however, to have "a very active imagination and command of the language." Martinez testified that the child had a tremendous vocabulary, very good expressive skills and appeared to have above average intelligence. She believed that the child possessed great potential if channeled properly, but observed that the child was guarded and vigilant around the respondent, and that the two seemed to have no affective link of comfort, security and trust. She concluded that the "child's bonding is not with the biological mother" and that the respondent had no idea how to connect with her child.

During two other visits in August, 1999, at the department office, which the respondent regarded as a more "neutral" setting than the foster home, Martinez observed the respondent and her child through a one-way mirror. At the first August, 1999 visit, the child

initially resisted entering the room and remaining alone with the respondent, who did not do anything negative. The child's foster grandmother stayed briefly and tried to reassure the child by saying that she would return. The respondent brought books to read to her daughter, but, although clearly enjoying the time with her daughter, the respondent remained generally passive. At the second visit, the child again resisted remaining alone with the respondent. She clung to her foster grandmother and stood between her and the door as if to impede her from leaving. Eventually, the child climbed onto the foster grandmother's lap and refused to get off. Thirty minutes into the session, the child said that she wanted to go home. The psychologist observed that the respondent had "no sense of what to do" and made minimal eye contact with her daughter. At trial, Martinez also noted that the child did not seem to recognize the respondent when she entered the room. The child appeared at ease with her foster grandmother but guarded with the respondent. Martinez concluded that from the child's point of view, relating to the respondent was like relating to a stranger.

Martinez also noted that the child's continued growth required a setting with people who were verbal and focused on education. Martinez believed that the respondent might be able to meet the child's physical needs and even have the capacity to develop and improve her parenting skills, but that she would not know how to stimulate the child intellectually and emotionally.

At the request of the respondent's attorney, the court appointed Rodolfo Rosado, a second psychologist, to observe the respondent with her daughter. Rosado's observations in many respects mirrored those of Mantell and Martinez. Like Mantell, Rosado administered various psychological tests to the respondent and discerned a possible learning disability. He determined

that her language related skills were significantly below average, but that her general intelligence was "likely average." Rosado also reported that the respondent told him that she had "relinquished her defiant stance and acquiesced to the expectations that were mandated by the department and the courts." Rosado further testified at trial that a possible explanation for the respondent's refusal to go to counseling is that "people of color [like the respondent] are less likely to use professional psychological and psychiatric services as a result of having been victims of discrimination."

As for the respondent's parental role, Rosado observed that the respondent recognized the importance of love and attention to children's needs, but that she was naive and lacked experience. Rosado concluded that the respondent's expectations did not fully prepare her for the challenges inherent in parenting and that it was unclear how she would face the conventional dilemmas and aggravations of parenthood.

Rosado twice observed the respondent and the child together. He commented that the child was "exceptionally bright" in both interpersonal psychological skills and language skills. His reports of the interactions between the child and the respondent were similar to those of Martinez. During the first visit, at which the respondent, the child and the child's foster grandmother were present, he observed that the child did not want to separate from the foster grandmother and became anxious and increasingly distressed in her absence. Conversely, she remained relaxed and playful as long as she had the security of her foster grandmother's presence. While the respondent behaved appropriately and "related well" to the child, Rosado observed "an inadequate parent-child attachment between [the child] and her mother." During the second visit, the child again did not want to be separated from her foster grandmother. When the foster grandmother discreetly

left the room, the child checked every ten minutes to make sure that her grandmother was nearby.

Rosado concluded that the respondent had made progress and was not depressed, but expressed doubt about her prognosis, stating that "there is a question about [the respondent's] ability to sustain these changes and exhibit further growth." At trial, Rosado moderated his views, saying that the respondent had a "favorable prognosis" and that he saw no reason why she could not be a parent.

The court determined that the credence awarded Rosado's observations should be tempered by the fact that he might not properly understand the circumstances surrounding visitation. For example, Rosado was under the impression that all of the visits occurred in the foster home, which led him to believe erroneously that the respondent never had the opportunity to visit the child in a neutral setting. In fact, the respondent and her mentor took the child out of the house for their visits from August, 1997, to January, 1998. Rosado also did not know about the significant gaps in visitation. When queried, he testified only that the respondent had "mentioned that she missed some recently because of her illness." He agreed that a break in visitation for nearly one year would have a major impact on the respondent's relationship with the child, and admitted that such a break, for a preschool child especially, would severely restrict the opportunity for a potential attachment relationship to develop between the parent and child. He also noted that one factor in any progression to more frequent or longer visits ought to be the parent's willingness to attend scheduled visits, and that without such a commitment there was no possibility of considering such a progression. His conclusion that there was no meaningful bond between the respondent and her daughter echoed that of Martinez. Rosado testified that he "did not see any behaviors or indications

that [the child] related to [the respondent] as a unique person that qualified as a kind of bonded or secure attachment."

It is clear that for several years the respondent consistently refused to take her visitation and counseling obligations seriously, thus putting, as the court observed, "her own needs first and those of [the child] second." While it is true that the respondent obtained employment and housing, participated in teen mentoring, was not involved in drugs and had no contact with the criminal justice system, her unwillingness to undertake specific steps to develop her parenting skills and bond with her daughter is equally important. Moreover, both psychologists noticed that the child exhibited anxiety toward the respondent and did not want to be in the same room with her in the absence of her foster grandmother. That the mother and child had no real relationship, despite the department's efforts to encourage one for more than three years, is noteworthy. Furthermore, the factual record indicates that the child is a bright, imaginative four year old who needs direction and stimulation, which the respondent does not seem able to provide.

The respondent argues that she has made long strides toward being a responsible parent and that she was in a better position to parent the child at the time the petition was filed than when the department initially removed the child from her custody. She cites *In re Jessica M.*, 49 Conn. App. 229, 714 A.2d 64 (1998), judgment vacated, appeal dismissed, 250 Conn. 747, 738 A.2d 1087 (1999), and argues that if the parents of a physically abused child can be found capable of rehabilitation in the near future, so too can she, a child herself when her baby was born, be found sufficiently rehabilitated to assume a responsible position in the life of her child within a reasonable time, especially if supported by existing social services. We are not convinced.

In *In re Jessica M.*, 250 Conn. 747, 738 A.2d 1087 (1999), our Supreme Court determined that the appeal was moot.[6] The Supreme Court vacated the judgments of the Appellate Court and the trial court, and dismissed the appeal. Id., 749. Thus, the respondent's reliance on that vacated judgment is misplaced. As to the respondent's remaining argument, despite the progress that she has made in improving her own life, her relative youth does not excuse her from failing to take advantage of the many opportunities she was offered to prepare herself for parenthood and to bond with her daughter through counseling and visitation.

We conclude that the court properly found that the respondent is not prepared to assume a responsible position in the life of her child, that she is not in a position to care for the child's particular needs and that there is no reason to believe that she will be in a position to do so within a reasonable time in the future, despite her belated efforts to seek counseling and visitation.

### III

The respondent next claims that the court improperly found that no ongoing parent-child relationship existed. For the reasons set forth below, we decline to review this claim.

In part II of this opinion, we concluded that the court properly found that the respondent had failed to achieve personal rehabilitation pursuant to § 17a-112 (c) (3) (B). We need uphold only one statutory ground found by the court to affirm its decision to terminate parental

---

[6] Before the Supreme Court heard the case but after the Appellate Court had affirmed the trial court's judgment dismissing a petition to terminate parental rights; *In re Jessica M.*, supra, 49 Conn. App. 229; the commissioner had filed a subsequent petition to terminate the respondent mother's parental rights, which the trial court granted. The respondent mother did not appeal, and the respondent father voluntarily relinquished his parental rights prior to the trial on that termination petition. *In re Jessica M.*, supra, 250 Conn. App. 748.

rights. *In re John G.*, 56 Conn. App. 12, 20 n.4, 740 A.2d 496 (1999). "To prevail on her claim that the court improperly terminated her parental rights, the respondent must successfully challenge all of the bases of the judgment terminating her parental rights. If [any] of the grounds on which the trial court relied are upheld on appeal, the termination of parental rights must stand." (Internal quotation marks omitted.) Id. Because one statutory ground for termination properly exists, namely, failure to achieve personal rehabilitation, we need not reach the respondent's claim that the court's finding of no ongoing parent-child relationship was improper. See *In re Shane P.*, supra, 58 Conn. App. 243.

## IV

### A

The respondent next claims that the termination of her parental rights violated her substantive due process and equal protection rights as guaranteed by the federal and state constitutions because the department failed to make reasonable efforts at reunification and failed to consider the respondent's age in its efforts. We decline to review this claim.

"Established wisdom counsels us to exercise self-restraint so as to eschew unnecessary determinations of constitutional questions." (Internal quotation marks omitted.) *State* v. *Campbell*, 224 Conn. 168, 175, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993). Where a conclusion can be based on established principles of statutory construction, the court need not determine whether constitutional principles also would require the same conclusion. See *In re Valerie D.*, 223 Conn. 492, 527, 613 A.2d 748 (1992).

Having concluded in part I of this opinion that the court properly found that the department made reason-

able efforts at reunification pursuant to the statutory requirement, taking into account the respondent's age-related needs, we find it unnecessary to address this constitutional claim.

## B

The respondent's next constitutional claim is that the court improperly found that there was no ongoing parent-child relationship prior to finding that the respondent was an unfit parent. We also decline to review this claim, having previously upheld the termination judgment on the ground of failure to achieve personal rehabilitation. See part II of this opinion.

## C

The respondent finally claims that she was denied her statutory and constitutional rights to effective assistance of counsel. She claims that counsel was ineffective because she failed to seek administrative remedies that could have resulted in (1) a more effective plan to transport the respondent to her visits with her child and (2) the provision of additional social services directed to reunification.

We reject this claim because the evidence overwhelmingly supports the finding of the court that the department provided more than adequate social services and transportation assistance to the respondent, and that the respondent's own resistance to department efforts encouraging her rehabilitation and reunification with her child ultimately resulted in the termination of her parental rights. We accordingly conclude that the respondent has failed to meet her burden of proving that any alleged inadequacy of counsel could have affected the outcome of the termination proceedings. See *In re Matthew S.*, 60 Conn. App. 127, 132–33, 758 A.2d 459 (2000).

The judgment is affirmed.

In this opinion the other judges concurred.