[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a petition seeking to terminate the parental rights of the parents of Eric A. Eric was born on October 1989. Ten months later he was taken into the care of the Department of Children and Youth Services, the predecessor to the present Department of Children and Families (DCF).[1]
Eric was adjudicated uncared for and was committed to the department from 1990 to 1997. During this time, the department filed a petition to terminate parental rights. The petition was denied by the court in 1993. The department continued working with the mother and, in July 1997, Eric was returned to her care. Less than eighteen months later, on December 19, 1998, Eric was again taken into care by DCF pursuant to an order of temporary custody. Because he had developed behavioral disorders, causing him to be oppositional defiant, aggressive and at times assaultive, several of Eric's placements were unsuccessful. In 1999 he was hospitalized after a suicide attempt. On December 28, 1999, the court found that Eric was neglected and committed him to the custody of DCF. That commitment has been successively extended.
The mother, Vicki A., was born on July 31, 1955. Since 1973, she has had dozens of hospitalizations, primarily psychiatric. According to one exhibit, by January 2000, she had over 70 in-patient psychiatricadmissions.[2] She has been diagnosed with overactive psychotic behavior, irritability with mood swings, manic depressive psychosis, personality disorder, schizophrenia and bi-polar disorder with psychotic features. Since Eric was removed from her care in December 1998, she has had ten hospitalizations, some earlier this year.
On September 21, 2001, DCF filed the instant petition to terminate the parental rights of Eric's parents. The father has consented. The mother has not. As to the mother, the petition is based on the failure "to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." General Statutes § 17a-112 (j)(3)(B)
The case was tried to the court on June 17, 18 2002. The court heard from five witnesses and received over a dozen exhibits into evidence.[3]
Because of the child's age and the extraordinary amount of time he has lived in foster care, the court issued its decision from the bench and has expedited the issuance of this opinion.
"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent . . . [and as such, it] is a most serious and sensitive judicial action." CT Page 7769 (Internal quotation marks omitted.) In re Jonathan M., 255 Conn. 208,231, 764 A.2d 739 (2001). "When petitioning to terminate parental rights without consent, [DCF] must allege and prove by clear and convincing evidence, one or more of the specific grounds set forth in General Statutes § [17a-112 (j)]. . . ." (Citations omitted; internal quotation marks omitted.) In re Kezia M., 33 Conn. App. 12, 16,632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993)
"In accordance with § 17a-112, [a] hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the . . . court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the . . . court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. in the dispositional phase, the . . . court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) In re Daniel C., 63 Conn. App. 339,348, 776 A.2d 487 (2001).
 I
"To terminate parental rights under § 17a-112 (c), now (j), the department is required to prove by clear and convincing evidence that it has made reasonable efforts to reunify the children with the parent unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. In accordance with § 17a-112 (c)(1), the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate. . . . (Citations omitted; internal quotation marks omitted.)In re Ebony H., 68 Conn. App. 342, 348-49, 789 A.2d 1158 (2002)
Here, there was a previous judicial determination, in 2000, made on clear and convincing evidence, that such efforts were no longer appropriate.
 II
"Failure of a parent to achieve sufficient personal rehabilitation is one of six [now seven] statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. . . . That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that CT Page 7770 child.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . [The appellate] court recently explained that in assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [his] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) In re Sheila J.,62 Conn. App. 470, 479-80, 772 A.2d 244 (2001)
"In determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in the specific expectations ordered by the court or imposed by the department." (Citations omitted.) In re Vincent D.,65 Conn. App. 658, 670, 783 A.2d 534 (2001)
A claim of failure to rehabilitate implicates a judicially created exception to the Practice Book rule, § 33-3 (a), that "[i]n the adjudicatory phase, the judicial authority is limited to events preceding the filing of the petition or the latest amendment." "Despite Practice Book § 33-3(a) and case law regarding termination proceedings generally, [the Appellate court has] determined that with regard to termination petitions brought under § 17a-112 (c)(3)(B), [now § 17a- (j)(3)(B)], the trial court may in the adjudicatory phase, properly consider facts and events that occur after the filing date of the petition in determining whether a respondent has achieved a sufficient degree of personal rehabilitation within the meaning of that statute. . . . In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree ofrehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Citations omitted; emphasis in original.) In re Latifa K.,67 Conn. App. 742, 748-49, 789 A.2d 1024 (2002)
With respect to the age and needs of the child: Eric is a 12 1/2 year CT Page 7771 old boy who has a tumultuous life. He was removed from his mother's care in 1990 at ten months, placed in foster care for about seven years and returned to his mother in 1997. Within eighteen months, he was again removed from his mother's care pursuant to a court order of temporary custody. He then suffered through over a half dozen placements and also through family therapy that failed largely because of his mother's issues. He was aggressive, oppositional, somewhat assaultive and had special education needs. As Dr. Kale, a psychiatrist, testified, Eric has an Axis I diagnosis of Attention Deficit Hyperactivity Disorder (ADHD); oppositional defiant disorder and Reactive Attachment Disorder. He has made remarkable progress with respect to the ADHD through medication and behavioral intervention. He has made slower progress but progress nonetheless with the other two diagnoses.
The court finds that Eric needs a safe, stable, sane home with a caring, nurturing and, hopefully, intelligent parent. Dr. Kale testified that for Eric to continue to make the progress he has achieved, Eric needs a stable, protected, predictable environment, and a parental figure able to demonstrate that a parent can own up to mistakes.
Since 1999, the Appellate Court has repeatedly emphasized that in assessing whether a parent has achieved sufficient personal rehabilitation for purposes of § 17a-112, "[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) In reMariah S., 61 Conn. App. 248, 261, 763 A.2d 71 (2000); accord, In re GaryB., 66 Conn. App. 286, 292, 784 A.2d 412 (2001); In re Amneris P.,66 Conn. App. 377, 384, 385, 784 A.2d 457 (2001); In re Daniel C., supra, 63 Conn. App. 354; In re Sheila J., supra, 62 Conn. App. 480; Inre Sarah Ann K., 57 Conn. App. 441, 448, 749 A.2d 77 (2000); In reShyliesh H., 56 Conn. App. 167, 180, 743 A.2d 165 (1999); In re DanuaelD., 51 Conn. App. 829, 840, 724 A.2d 546 (1999).[4]
DCF has been working with the mother for over a decade. DCF, and the State generally, have provided her with mental health care in the form of therapy and hospitalizations. DCF returned Eric to her care in October 1997 albeit not without serious concerns. Any optimism proved to be unwarranted and Eric was removed from his mother's care within eighteen months pursuant to an order of temporary custody.
The reports from some of the institutions in which the mother recently has been hospitalized reflect the depth of her illness. In January 2000, the mother was admitted into Hartford Hospital on a physician's emergency certificate. She had been brought to the emergency room by police who observed her acting erratically and violently ("tearing up the place"). On admission, the mother's affect included "periods of loud yelling and CT Page 7772 agitation. Her thoughts were disorganized and notable for paranoia. . . . [S]he is threateninq physically and verbally. She is disoriented to place and time. Her judgment, insight and impulse control are gravely impaired."
Between July 23, 2001 and August 17, 2001, the mother was in-patient at the Institute of Living to which she had been referred by Capitol Region Mental Health Center "because she had been noncompliant with her medication and quite manic. She was very hostile in her mania, quite driven and irrational, and making poor judgments. She would not listen to advice from anyone concerning her situation."
On January 22, 2002, the mother was again admitted into a hospital pursuant to a physician's emergency certificate. The admitting physician observed that the mother was agitated, her thoughts were "disorganized and delusional" and she was experiencing auditory hallucinations. The physician noted on the certificate than the mother was "gravely disabled" and was "dangerous to . . . herself or others."
Between March 3, 2000 and April 28, 2000, the mother was in-patient at John Dempsey Hospital. This was the third hospitalization this year at that hospital. The mother had not been compliant with her medications between discharges, and "her condition severely decompensated. She became increasingly loud, difficult to interrupt, agitated, became increasingly grandiose and paranoid, and several times she confronted drug dealers in her neighborhood, not realizing the danger involved with this situation." When she was admitted to the hospital this time, she was in restraints and "[h]er thought process was disorganized. . . . She was also very suspicious and had persecutory and paranoid delusions."
Obviously, the mother has a serious psychiatric illness. Dr. Richard Sadler, a child psychiatrist and medical director of a children's in-patient psychiatric unit, evaluated the mother in 1999 and earlier this year and also met with Eric in 1999. He testified that the mother suffered from a chronic relapsing psychiatric illness that is not able to be adequately stabilized. In 2002, her illness had not improved or stabilized and it was not likely that her condition would improve in the future. Sadler observed that the pattern of the illness had been consistent over many years and that the mother did not understand the nature of her illness. He further opined that the mother does not understand Eric's needs and that she is unable to parent a teenage boy. With respect to Eric's particular needs, he testified that it was unlikely that the mother would provide Eric with his medication. This was abundantly clear since the mother does not believe Eric needs medication, is contemptuous of his health care providers and does not take her own medication. CT Page 7773
It is true that, as the mother's counsel adroitly elicited on cross-examination, Sadler is not the mother's physician and he believed the mother's proper diagnosis was paranoid schizophrenia and not bi-polar disorder. However, Sadler also testified that both illnesses caused impairment and that the treatment for both disorders was essentially the same.
Family therapy failed largely because the mother would not listen to what others said. She failed to take her prescribed psychiatric medications consistently, as reflected by the testimony of Katherine Levy and Carolyn Simoes-Velt. She has had approximately nine psychiatric hospitalizations since December 1998. However, whether or not she has been taking her medication, at no time since 1998 had she made sufficient progress to be a caretaker of her son. This is evidenced by her behavior as noted in some of her recent hospitalizations and her inappropriate behavior in visits and in family therapy. As observed supra, Dr. Kale testified that for Eric to continue to make the progress he has made, Eric needs a stable, protected, predictable environment, and a parental figure to demonstrate that a parent can own up to mistakes.
"The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks omitted.) In re John G., 56 Conn. App. 12, 24, 740 A.2d 496 (1999).
Termination has been consistently recognized as being warranted "when the parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." In re Nicolina T., 9 Conn. App. 598,605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); see also In re Juvenile Appeal (83-BC), 189 Conn. 66, 78-79, 454 A.2d 1262
(1983) (noting that legislature may authorize the termination of parental rights without a finding of parental fault); In re Antony B.,54 Conn. App. 463, 473, 735 A.2d 893 (1999) (same) Our Supreme Court has held that a parent's rights can be terminated because of her mental condition, even if she is not at fault. "[I]n weighing the interests of the child against the hardship imposed on the parent, the legislature may properly strike the balance at the point where the mental deficiency, even though involving no fault, is so great as to render the parent incapable of measuring up to the child's needs as those are delineated in [§17a-112 (j)]." In re Jessica S., 51 Conn. App. 667, 673-74, 723 A.2d 356, cert. denied, 251 Conn. 901, 738 A.2d 1090 (1999). In re Stanley D.,61 Conn. App. 224, 763 A.2d 83 (2000).
Based on the evidence of Eric's needs and the depth and persistence of the mother's psychiatric illness and her recurring symptoms, the court finds that it is not reasonably foreseeable that the mother will be able CT Page 7774 to care for Eric at any time in the future. See In re Eden F.,250 Conn. 674, 707, 741 A.2d 873, reargument en banc denied, 251 Conn. 924,742 A.2d 364 (1999) (trial court's finding, based on psychological evidence, that, in light of the serious and chronic nature of mother's mental illness, her future prospects for assuming a responsible parenting role for her children were bleak, upheld)
By clear and convincing evidence the court finds that the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of Eric, who has been found to be neglected, that the respondent could assume a responsible position in his life.
 V A. Mandatory Findings
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., 62 Conn. App. 307, 315,771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev, to 1999) § 17a-112 (d) [now § 17a-112 (k)]." (Footnote omitted; internal quotation marks omitted.) In re Deana E.,61 Conn. App. 185, 189-190, 763 A.2d 37 (2000)
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
DCF timely and over a considerable time offered the mother visitation, psychological evaluations, psychiatric care and case management services. DCF also timely provided foster care, psychiatric care and psychological therapy to Eric, all of which facilitated reunion.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
DCF used reasonable efforts to reunite the family. CT Page 7775
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
The mother kept all appointments, or virtually all, with DCF.
The mother kept her whereabouts known to DCF.
The mother participated in individual and family counseling but did not make progress toward being able to care for her son.
The mother was not offered in-home support services.
The mother did not follow recommendations of service providers in that she did not consistently take her prescribed medication.
There is no evidence that the mother failed to sign releases.
There is no evidence that the mother failed to secure and maintain adequate housing and legal income.
There is no evidence that the mother engaged in substance abuse.
There is no evidence that the mother had involvement with the criminal justice system.
The mother visited Eric as often as DCF permitted. She did not always demonstrate appropriate parent-child interaction during the visits. She did not possess dangerous weapons or instruments during the visits.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Eric loves his mother. He knows that she cannot take care of him. He would like to see her on infrequent occasions. Eric is bonded, however, to his foster father, Mr. Robinson, who is his psychological parent.
5. Finding regarding the age of the child.
Eric is now 12 1/2. CT Page 7776
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
The mother consistently visited Eric whenever she was not hospitalized. She complied with the court's expectations to the extent described supra. However, she has not consistently taken her psychiatric medication and her condition has not improved such that she can care for Eric.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
There was no evidence that the mother was prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent or the unreasonable act of any other person or by her economic circumstances.
 B.
Although in determining whether to grant a petition to terminate parental rights the court statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now § 17a-112 (k); Inre Tyscheicka H., supra, 61 Conn. App. 26; "[t]he trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208,742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000) "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re JoshuaS., 260 Conn. 182, 209, ___ A.2d ___ (2002).
What the court stated in In re Ashley S., 61 Conn. App. 658, 667,769 A.2d 718 (2001), is true here: "It is clear that the respondent loves CT Page 7777 her child and wants [him] back. . . . [H]owever, [a] parent's love and biological connection . . . is simply not enough. [The department] has demonstrated by clear and convincing evidence that [the respondent] cannot be a competent parent to the child because she cannot provide [him] a nurturing, safe and structured environment." (Internal quotation marks omitted.) See also In re Eden F., supra, 250 Conn. 707-708.
The expert evidence is that Eric needs a stable, structured home with consistency. His mother cannot provide that. Her serial psychiatric hospitalizations and her behavior in visits and family therapy evidence this. Dr. Kale and Dr. Sadler testified credibly chat adoption would be psychiatrically beneficial to Eric. Although Eric is understandably conflicted about the possibility of never seeing his mother or sibling again, contact with his mother, at least in the absence of permanency, is generally harmful to him.
The stable, structured home with consistent rules and expectations that Eric needs he has found in the home of a truly good and nurturing man. Under the care of Mr. Michael Robinson, a man who clearly lives his principles, Eric is starting to thrive. His behavior has improved and he is progressing academically. Eric wants to be adopted by Mr. Robinson and Mr. Robinson is willing to adopt Eric. Eric has spent a total of ten of his 12 1/2 years in foster care; there is no reason to delay that adoption and again inflict on Eric the "deleterious effects of prolonged temporary placement." In re Joshua S., supra, 260 Conn. 199. The court finds by clear and convincing evidence that it is in Eric's best interests that the respondent mother's parental rights be terminated.
 III
The petition is granted. The court terminates the respondents parental rights. The Commissioner of the Department of Children and Families is appointed statutory parent for Eric for the purpose of securing a permanent adoptive family. Mr. Michael Robinson shall be given the first opportunity to adopt Eric, and DCF shall affirmatively do everything reasonable to facilitate the adoption of Eric by Mr. Robinson. The commissioner shall file with this court no later than 30 days following the date of judgment a written progress report of efforts to effect such permanent placement and file further reports every three months thereafter, as required by state and federal law.
Dated at Middletown this 19th day of June, 2002.
BY THE COURT
___________________ Bruce L. Levin CT Page 7778