[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On October 5, 2000, the petitioner, the Commissioner of the Department of Children and Families (DCF), filed a petition pursuant to C.G.S. § 17a-112 et seq. to terminate the parental rights of Maria I. as to three of her children, Mark W., Nino I., and Elana H. The petitioner also sought to terminate the parental rights of Wesley Barnard P.,[1] father of Nino, Gentress H., father of Elana H., and an unknown father of Mark W., John Doe. The petitions were amended on March 27, 2002. Respondent mother appeared in court on April 30, 2002 and consented to termination of her parental rights. Respondent fathers Bernard P. and Gentress H. both contest termination of their parental rights. Trial of this matter took place before this court on April 30, 2002 at the Regional Child Protection Session at the Middlesex J.D. For the reasons stated below, the court finds in favor of the petitioner.
The three statutory grounds alleged against Bernard P., father of Nino, were (1) that the child Nino has been abandoned by Bernard P. (C.G.S. § 17a-112 (j)(3)(A); (2) that the child Nino was found in a prior proceeding to have been neglected or uncared for and the father had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, he could assume a responsible position in the life of the child (C.G.S. § 17a-112 (j)(3)(B)(i)); and (3) that there is no ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral or educational needs of the child, and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child. (C.G.S. § 17a-112 (j)(3)(D)).[2]
The single ground alleged in the petition against Gentress H. is that his child, Elana, was found in a prior proceeding to have been neglected or uncared for and the father had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, he could assume a responsible position in the life of the child (C.G.S. § 17a-112 (j)(3)(B)(i)). CT Page 9566
As to John Doe, unknown father of Mark W., the grounds alleged were (1) that the child Mark W. has been abandoned by John Doe (C.G.S. § 17a-112
(j)(3)(A)); and (2) that there is no ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral or educational needs of the child, and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child. (C.G.S. § 17a-112 (j)(3)(D)).[3]
The court finds that notice of this proceeding has been provided in accordance with the provisions of the Practice Book. The court further finds that the Child Protection Session of the Superior Court, Juvenile Matters Division, has jurisdiction over the pending matter and that no action is pending in any other court affecting custody of the children.
"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent. . . . [As such, it] is a most serious and sensitive judicial action." (Citation omitted; internal quotation marks omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001); In re Bruce R., 234 Conn. 194,200 (1995).
The termination of parental rights is governed by statute. C.G.S. § 17a-112. In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of filing the petition or the last amendment, by clear and convincing evidence. In re Joshua Z., 26 Conn. App. 58, 63 597 A.2d 842 (1991), cert. denied, 221 Conn. 901 (1992); In re Teresa S., 196 Conn. 18
(1985); Practice Book 33-1 et seq. Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC),194 Conn. 252, 258 (1984); In re Karrlo K., 44 Conn. Sup. 101, 106
(1994), aff'd, 40 Conn. App. 73 (1996).
Termination of parental rights trials proceed in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established by clear and convincing evidence the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re JuvenileAppeal, (84-AB), 192 Conn. 254, 264 (1984). "Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re Daniel C., 63 Conn. App. 339, 357
(2001). In this case, the petitions were last amended on March 27, 2002. However, "[i]n the adjudicatory phase, the court may rely on events CT Page 9567 occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree ofrehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." In re StanleyD., 61 Conn. App. 224, 230, 763 A.2d 83 (2000) (emphasis in original); see In re Latifa K., 67 Conn. App. 742, 748, 789 A.2d 1024 (2002).
If at least one pleaded ground to terminate is found, the court proceeds to the disposition stage. The court must consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. In re Eden F., 250 Conn. 674, 688-89,741 A.2d 873 (1999); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Quanitra M., 60 Conn. App. 96, 102,758 A.2d 863, cert. denied, 255 Conn. 903 (2000); In re Nicolina T.,9 Conn. App. 598, 602, 520 A.2d 639, cert. denied, 203 Conn. 804,525 A.2d 519 (1987); In re Emmanuel M., 43 Conn. Sup. 108, 113,648 A.2d 904, aff'd, 35 Conn. App. 276, 278, 648 A.2d 881, cert. denied,231 Conn. 915, 648 A.2d 151 (1994).
I. FACTS
Witnesses at trial included DCF worker Maureen O'Connor, the children's therapists, a Department of Corrections counselor, a rehabilitation program counselor from Connections House, and respondent Bernard P. The Court has considered the documentary evidence as well as the testimony of the witnesses. The credible evidence admitted at trial supports the following facts by clear and convincing evidence.
Mark W. was born on January 1991. Although Mark W., Sr. was originally named as the father of Mark W., he has been excluded as a result of paternity testing. Despite efforts by DCF, no other individual has been identified as a father. Nino I. was born on June 1992. His father is Bernard P. Elana H. was born on September 1993. Her father is Gentress H. These three half siblings have a younger half-sibling, Monica A., born in 1996, who resides with her father and who is not a subject of these petitions. When Mark was born, his mother, Maria I., was 16 years old and was receiving services through the court and DCF as a minor child under her mother's open cases with DCF and the court.
This family has a lengthy history with DCF beginning in 1993 with reports of abuse and neglect. In 1994, the children's maternal CT Page 9568 grandmother, Mildred I., was granted legal guardianship through Probate Court when Maria I. left the state after her physical safety was threatened by an ex-boyfriend. Subsequently, DCF opened a protective service case regarding Mildred I., based on allegations that Mildred I. was abusing her children and that the children in her home were exposed to drugs and paraphernalia brought into the home by family members. In 1995, Mildred I. voluntarily placed Maria I.'s three children in DCF care. After being placed in foster care, the oldest child, Mark W., who was then four years old, disclosed that he had been sexually abused by his maternal grandmother, a maternal aunt and uncle as well as maternal grandmother's live-in boyfriend.
Reunification services were put in place and in February, 1997, Maria I. requested and received full custody of these three children through a revocation of commitment issued by the Superior Court for Juvenile Matters in Waterbury, (McLachlan, J.). Approximately a year and a half later, in August, 1998, DCF received a referral from Saint Mary's Mental Health Hospital in Waterbury reporting that Maria I. was at the hospital requesting to be committed for mental health treatment. She had been prescribed Prozac several weeks earlier and had stopped taking it. On August 17, 1998, DCF invoked a 96 hour hold on all four children based upon Maria I.'s need for mental health stabilization, and sought an Order of Temporary Custody because of mother's mental health and inadequate living conditions. The OTC was sustained on August 28, 1998. (Holden, J.) The children were adjudicated neglected and committed to the care and custody of DCF for the second time on November 16, 1998. (Holden, J.) Specific steps were issued by the court on November 16, 1998 as to Maria I. and Gentress H., and on August 28, 1998 as to Maria I. and Bernard P.
A. Respondents
1. Respondent Mother
Respondent mother Maria I. was born on April 4, 1974 in Bronx, New York. She was the second child of Mildred I. and Caraballo N. She was placed in foster care at the age of seven months after her stepfather stabbed her in the heart. She remained in foster care until she was eight where she was physically and sexually abused and beaten. She was physically abused by her mother and sexually abused by her brothers and her mother's boyfriend. Maria I. quit school in 9th grade when her first child was born. She has suffered from mental illness and attempted suicide on many occasions. She has had at least three psychiatric hospitalizations. She was sexually abused many times, including by Bernard P., father of Nino. Respondent mother also has a substantial history of substance abuse including marijuana, cocaine and alcohol. She has a history of transience with periods of unemployment and CT Page 9569 homelessness, and a criminal history.
2. Respondent Father of Nino — Bernard Wesley P.
Bernard P. was born in Waterbury, CT on February 28, 1964. His son Nino was born as a result of a relationship with Maria I. which was marred by violence.[4] Bernard P. has an extensive criminal history including convictions for tampering with evidence, burglary in the 3rd degree, burglary in the 2nd degree, failure to appear, breach of peace, larceny in the 3rd, 5th and 6th degrees, violation of probation and three convictions for possession of narcotics on May 13, 1986, May 18, 1990 and July 11, 1997. At the time of trial, Bernard P. had numerous cases pending in Middletown for which he was incarcerated pretrial. He had 11 arrests which had occurred from March 15, 2001 forward for offenses including burglary in the 2nd and 3rd degrees, larceny in the 3rd
4th and 5th degrees, criminal mischief and witness tampering. He testified that he was in the process of resolving the charges through a plea agreement which included an offer of two years.
Bernard P. first met his son when Nino was 6 years old. Bernard P. did not request visits with Nino until the middle of 1999. He has visited with his son about a dozen times during Nino's life. His last visit was in September, 2000 while he was incarcerated. From February 14 through May 16, 2000, Bernard P. resided at Connection House as part of a community work release program. Patricia Clark, a substance abuse counselor at the program, testified that Bernard P. was reincarcerated and discharged from the program based on a violation of program rules which require that clients go directly to designated locations, such as their place of employment, and no where else. Bernard P. was supposed to be at work, and then report directly home. Instead, he was seen by another staff person in the community. His "unauthorized whereabouts" were in violation of program rules. Thus, although substance abuse tests were negative during this time, because this was his second violation of the rules concerning unauthorized whereabouts, he was returned to custody. His record also reflects that after he was released on supervised parole in October 2000, he absconded from that parole and was returned to custody in February 2001.
Although not in custody at the time, Bernard P. failed to attend Administrative Case Reviews in January and July, 2001, and a court-ordered parent child evaluation in August, 2001.
Specific steps were issued by the court (Holden, J.) on August 28, 1998 as to Bernard P. These steps required, among other things, that he keep all appointments set by or with DCF, that he visit the child as often as DCF permits, that he participate in parenting, individual and family CT Page 9570 counseling, that he participate in drug/alcohol evaluation and counseling, that he secure and maintain adequate housing and legal income, that he engage in no substance abuse, and that he have no further involvement with the criminal justice system. Bernard P. failed to comply with these steps in that he failed to keep all appointments with DCF, he failed to visit the child as often as DCF permitted, he failed to participate in parenting, individual and family counseling and he had substantial additional involvement with the criminal justice system. He did complete some DOC addiction related programs.
Bernard P. has had no contact with DCF since August, 2001. He testified that he knew as early as 2000 that he would have to complete parenting programs and be in a position to provide a stable home for his son in order to spend more time with him, but nevertheless was reincarcerated on numerous charges and absconded from supervised parole. He stated that he had a job installing carpet waiting for him when he was released from incarceration, but did not know when that would occur. He had no more specific plans for the care of his son, but he indicated that he believed his son needed a male role model in his life and he wished to fulfill that need. He has never sent cards, letters or gifts to Nino or provided emotional or financial support to his son.
3. Respondent Father of Elana — Gentress H.
Gentress H. was born November 24, 1966 in Long Island, New York. He was raised by his mother until the age of 9, and then by his mother and maternal grandparents. Gentress H.'s father abused alcohol and is serving a 30 year sentence for murder in a New York prison.
Gentress H. graduated from high school in 1985. He served in the Army, and despite some disciplinary problems and a reduction in rank, he received an honorable discharge. He has had numerous jobs in many fields including working as an auto mechanic, cook, furniture mover, tow truck driver and gas station attendant, among others. He has a 9 year history of marijuana and cocaine use. He has an alcohol abuse problem which has resulted in losing employment, losing his driver's license, and traffic citations, among other things. He is currently incarcerated for the third time, having been convicted in Connecticut on June 11, 1999, on three counts of sale of narcotics for which he received a sentence of 11 years, suspended after four years to serve, with five years probation. He was convicted in New York on June 25, 1990 of sexual abuse in the second degree. He was sentenced to 6 months.
He was not involved with his daughter Elana for the first few years of her life and has been incarcerated almost half of her life. Gentress H. received custody of Elana under an order of protective supervision in CT Page 9571 December, 1998 and then lost custody of her in February, 1999 when he was incarcerated in connection with his narcotics convictions.
Specific steps were issued by the court (Lopez, J.) on December 19, 1999 to facilitate reunification. These steps required that respondent father keep all appointments set by or with DCF, cooperate with DCF home visits, announced or unannounced, and visits by the child's court appointed attorney and/or guardian ad item; keep children's whereabouts and your own whereabouts known to DCF, your attorney and the attorney for the children; participate in counseling and make progress toward the identified treatment goals including parenting and individual counseling; accept and cooperate with in-home support services referred by DCF and make progress toward the identified goals; submit to substance abuse assessment and follow recommendations regarding treatment; successfully complete substance abuse treatment including in-patient treatment if necessary and follow recommendations regarding after care treatment, including relapse prevention; obtain and/or cooperate with a restraining/protective order and/or other appropriate safety plan as approved by DCF to avoid further domestic violence issues; sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for future use in proceedings before the court; secure and/or maintain adequate housing and legal income; no substance abuse; no involvement/further involvement with the criminal justice system; cooperate with the Office of Adult Probation or parole officer and comply with conditions of probation or parole; and visit the child as often as DCF permits and demonstrate appropriate parent/child interaction during visits.
In terms of compliance with these steps, Gentress H. completed the Tier I Substance Abuse Education Program held at the Bridgeport Correctional Center on January 19, 1999, the Tier III Journey Program on September 9, 2000 and the VOICES program at the Correctional Center in Enfield on September 13, 2001. Tier I and Tier III are programs designed to provide addiction services and the VOICES program is designed to assist inmates in understanding the perspective of the victim. Thus, although he has completed substance abuse programs, he has not completed parenting or individual counseling and as of both the adjudication date and the trial date, he had not obtained adequate housing and legal income.
A counselor for the Department of Correction (DOC), Ross Sutherland, testified that Gentress H. had elected to participate in addiction related services, including Tier II, and that he had not participated in any sex offender programs while incarcerated. At the time of trial, Gentress H. was awaiting community release under which he would be monitored and supervised by the special management unit of parole. CT Page 9572 Special conditions of release include outpatient mental health treatment, specifically, sex offender programming, no contact with minors without permission (because the sexual abuse conviction involved a six year old minor) and no consumption of alcoholic beverages.
Thus, although respondent Gentress H. has complied with some of the specific steps, he has not complied with all of them. Although Gentress H. did participate in some visitation with Elana while incarcerated and did have custody of her for approximately two months, he has not served as a parent for her since February, 1999.
4. Respondent John Doe, Father of Mark W.
After Mark W., Sr.'s exclusion as the father of Mark through paternity testing, no one else has come forward as the father of Mark. Although DCF sought to obtain the names of possible fathers, mother was unwilling to provide any names to DCF. John Doe has never met his son. He has not provided financial or emotional support or sent cards, letters or gifts for Mark W. He has never contacted DCF to inquire about the child or to seek visitation with him.
DCF's efforts to locate John Doe included publication of a notice to "John Doe, father of male child born 1/91 to Maria [I.]" which appeared in the Waterbury Republican American on February 15, 2002 for a court date of March 27, 2002.
B. The Children
1. Mark W.
Mark W. was born January 1991. Mark experienced his first foster placement at the age of four when his maternal grandmother voluntarily placed him in DCF care. He was returned to his mother in 1997, but again placed in foster care n 1998 when his mother sought to be committed for mental health treatment. Mark is now 11 years old and a troubled child with numerous difficulties including aggression, and verbally and socially inappropriate behavior. He has exhibited highly sexualized behaviors consistent with having been sexually abused by his maternal grandmother, aunt and uncle. He molested his brother, his two sisters and other children in foster placements. He has been hospitalized for violent behavior and suicidal ideation. He has been diagnosed as having an anxiety disorder, post traumatic stress disorder, impulse control disorder and a conduct disorder.
Mark is in the fifth grade and receives special education. He is a good student, but due to his fragile mental state and lack of coping skills, CT Page 9573 his progress is hindered and he does not do well with his peers. He participates in after school activities including a drum corps in which he and his brother Nino participate together. He is also involved in a mentoring program for positive communication and role modeling.
Visitation with his mother triggered sexual behavior and visits were therefore suspended. Mark does not ask about his father at all and rarely asks about his mother.[5] Mark participates well in therapy and is on medication for Attention Deficit Hyperactivity Disorder ("ADHD") and anxiety. He is a troubled boy who does not understand a lot of the things that have happened in his family.
Mark is doing very well in his placement with his foster family. He has lived with this foster family for over three years following a series of disruptions due to his behavior. Nino was placed in the foster home with Mark in the summer of 2001. Being placed together has given the brothers an important sense of family and security. Omar Ramirez, Mark's counselor for approximately 2 1/2 years, testified credibly that Mark has made significant improvement since he was placed with his foster mother. At home his situation is very stable and he now has only minor problems at school. Mr. Ramirez credibly testified that these successes were a result of a permanent placement with a preadoptive foster parent who has patience and persistence, and who is not discouraged by complaints, but who seeks help when needed. He described the foster mother as one who provides guidance, and who is committed to Mark (as well as Nino) and who will not give up on him. The stability provided by this caregiver has permitted consistent work with his therapist in order to establish and meet goals. The boys' caretaker is committed to providing permanency for both boys, now aged 11 and 10.
2. Nino I.
Nino was born in June 1992, in Waterbury, following an abusive relationship between his mother and Bernard P. He was placed in his maternal grandmother's care for the first few years of his life. He first came into foster care at the age of three. Although he was diagnosed with a failure to thrive, he received services from Birth to Three and Easter Seals and his language and development improved.
Nino is now in the fourth grade and receives special education. He takes medication for anxiety and ADHD and is aggressive and easily provoked. Nino has few expectations of his parents. Although he has had visitation with Bernard P., his father has not been a consistent figure in his life. Nino has not spoken of his father to DCF social worker O'Connor. He shows concern for his mother and is aware of the domestic violence between his mother and father. CT Page 9574
Nino is doing very well in the same placement as Mark. They now see the same therapist, Mr. Ramirez, which provides consistency for their mental health. He seems happier now that he is living in a home with his brother with a caretaker who will not give up on him, who is committed to Nino and his brother and who is willing to adopt them both.
3. Elana H.
Elana was born in September 1993. She was placed in foster care as an infant in 1994 when her grandmother voluntarily placed her and her siblings with DCF. She is now 8 years old and has been placed seven times including a placement with her maternal grandmother, four foster placements, and one return to each of her parents. She was returned to her mother in 1997 and was briefly placed with her father in December, 1998 until he was incarcerated for selling narcotics in February, 1999. When Elana was returned to her mother, she suffered third degree burns to both feet when she was scalded while drawing a bath for herself. She is very sensitive about the scarring on her feet and has required pediatric care and physical therapy to deal with the scarring which effected the growth of her feet.
According to her therapist, Ms. Femino, Elana has extreme anxieties. Elana takes Risperdal for sleep disturbance, hyperactivity, anxiety, fears and nightmares. She is also on medication for bedwetting. Her anxiety is so extreme that at times she makes herself physically ill. She is extremely anxious about who will take care of her if something happens to her foster mother. She requires constant reassurance.
She knows her mother and father, but does not speak of them or remember them in her day to day life. During visitation at the correctional facility with her father, Elana had no difficulty with separation and, in fact, was anxious to end the visits. She asked her father poignant and pragmatic questions about where he would live when he got out and how he would take care of her. Visitation with her father at the correctional facility was suspended due to an escalation of anxiety surrounding the visits. Ms. Femino noted a correlation between the cessation of visits with respondent father and Elana's improved ability to stabilize at the preadoptive home.
In July, 2001 Elana was placed in a preadoptive home after several months of visitation. She had previously been in a foster home in which another child in the home was adopted while Elana was not, adding to her insecurity and anxiety surrounding her care.
Elana is a shy, quiet third grader who receives support at school to CT Page 9575 assist with her social and emotional needs. Elana loves her school and enjoys dance and art museums, as well as hiking and bike riding. She has done very well following her placement in the preadoptive home both in terms of forming an attachment with her foster family and in adjusting to a new school system. She has also done well in terms of her ability to verbalize her likes and concerns and has made progress in her mental health treatment.
Elana can be a difficult child whose specialized needs require a stable and knowledgeable caregiver. Elana would like to have no more moves or upsets, and would like to be settled. Elana is worried that she will be removed from her current preadoptive home and returned to the foster care system. She is an emotionally fragile child who has no faith that her parents could keep her safe and secure. She requires a lot of reassurance, affection and adult supervision. Due to the number of moves she has had already, further moves would be extraordinarily detrimental to Elana.
In sum, all three children continue to have many special needs as a result of the severe neglect and abuse (including sexual abuse) to which they were subjected. All three will require continued therapy and medication to help them overcome their difficulties. All three are in grave need of stability and permanence.
II. ADJUDICATION
Each statutory basis set out in General Statutes Section § 17a-112
(j) is an independent ground for termination. The petitioner is required to prove one or more of the two grounds alleged in its petition by clear and convincing evidence. In re Baby Girl B., 224 Conn. 263, 618 A.2d 1
(1992).
A. Location and Reunification § 17a-112 (j)(1):
In order to terminate parental rights, DCF must prove, by clear and convincing evidence, the statutory element requiring "reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." C.G.S. § 17a-112 (j)(1). "Although [n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted; citation omitted.) In re Mariah S.,61 Conn. App. 248, 255, 763 A.2d 71 (2000). CT Page 9576
With regard to John Doe, father of Mark W., the court finds that DCF made reasonable efforts to locate him. Mark W., Sr. was the individual identified by mother as the father. When he was excluded as a result of paternity testing, mother refused to provide any other names of possible fathers. A notice to "John Doe, father of male child born 1/91 to Maria [I.]" was published in the Waterbury Republican American on February 15, 2002 as ordered by the court. In the absence of any further information from mother, DCF's efforts to locate John Doe were reasonable. Because John Doe did not appear in this case, the court finds that he is unable or unwilling to benefit from reunification efforts
With regard to Bernard P. and Gentress H., the court finds that DCF made reasonable efforts to reunify the fathers with their children. As to Gentress H., Elana was placed with him for a brief period of time until his arrest in February, 1999. After that time, visitation was provided until it was ordered suspended because, as Ms. Femino testified, there was a correlation between Elana's escalating anxiety and fear surrounding visitation with Gentress H. DCF also provided case management and recommendations for services while incarcerated.
As to Bernard P., DCF provided visitation and referrals for other services including parenting classes, individual counseling and anger management groups at Connection House. Visitation was first requested and begun in 1999 and Nino's last visit with Bernard was in September 2000. As to both Gentress H. and Bernard P., they were incarcerated for significant periods of time while their children were in DCF care.
While a respondent parent is imprisoned, DCF is effectively excused from providing reunification services to the parent other than visitation. See generally In re Roshawn R., 51 Conn. App. 44, 56-57,720 A.2d 1112 (1998) (together with other factors, respondent's incarceration prevented DCF from providing reunification services). For a review of Superior Court cases applying this rule, see In re Destiny Q., Superior Court, Juvenile Matters, Child Protection Session, Docket No. U06-CP98-002230-A (Nov. 19, 2001, Levin, J.). Pursuant to C.G.S. §18-81, the Commissioner of Correction is responsible for providing "treatment, vocational and academic education" programs to inmates incarcerated in Connecticut. Here, the respondent fathers did take advantage of some DOG programs, and DCF could not provide services other than visitation while respondent fathers were incarcerated.
The Court finds by clear and convincing evidence it has been proved that respondent fathers are unable or unwilling to benefit from reunification efforts. Gentress H. was reunified, but was subsequently arrested and sentenced for selling narcotics. While incarcerated, he did CT Page 9577 not undergo sex offender counseling and will be released with conditions of parole that prohibit contact with a minor child without permission.
Bernard P., after being released to Connection House, violated the rules and was reincarcerated. He later was released on supervised parole and absconded, resulting in his reincarceration. Certainly, Gentress H. and Bernard P's incarcerations were due to circumstances of their own making, including Gentress H.'s sale of narcotics and Bernard P.'s 11 arrests for numerous criminal acts from March 2001 forward. By virtue of the length of their periods of incarceration, and considering the severe emotional needs of these children, the respondent fathers are unable or unwilling to benefit from reunification efforts.
B. Abandonment: C.G.S. § 17a-112 (j)(3)(A)
Petitioner has alleged as to respondent fathers John Doe and Bernard P. that they have abandoned Mark and Nino, respectively.
"Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. Inre Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801
(1981)." In re Kezia M., 33 Conn. App. 12, 18, 632 A.2d 1122, cert. denied, 228 Conn. 915 (1993); In re Terrance C., 58 Conn. App. 389, 394
(2000). This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Sporadic efforts are insufficient to negate the claim of abandonment. In re Roshawn R., 51 Conn. App. at 53. Indicia of interest, concern and responsibility include "attempts to achieve contact with a child telephone calls, the sending of cards and gifts, and financial support." In re Drew R., 47 Conn. App. 124, 129 702 A.2d 647
(1997). The test for determining abandonment of a child for purposes of termination of parental rights cases is not whether a parent has shown "some interest" in his or her child, but rather, whether the parent has maintained any reasonable degree of interest, concern or responsibility as to the child's welfare. In re Rayna M., 13 Conn. App., 23, 36,534 A.2d 897 (1987).
Mark W. was the product of a relationship between mother and an unidentified father who took no responsibility for his child. John Doe has never taken advantage of visitation services, and Mark has never met his father. See In re Deana F., et al., 61 Conn. App. at 185. John Doe has never sent any cards, letters or gifts to or for his child and has never contacted DCF to inquire about his child's well-being. CT Page 9578
Respondent father John Doe has made no effort at any time to contact his child. He has not maintained any interest in his child, let alone a reasonable degree of interest, concern or responsibility for the welfare of his child. The court therefore concludes that this ground has been established by clear and convincing evidence as to John Doe.
With regard to respondent father Bernard P., imprisonment alone does not constitute abandonment. In re Juvenile Appeal, 187 Conn. 431, 443
(1982). However, "the inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources for contact with a distant child." Id. A parent's incarceration is no defense to an abandonment allegation. The parent has an affirmative obligation to take advantage of visitation services. In reRoshawn R., 51 Conn. App. 44 (1998). Certainly respondent father was subject to those limitations and restrictions inherent in incarceration. See In re Shane P., 58 Conn. App. 244, 256 (2000) (and cases cited therein). Here, however, even while not incarcerated, respondent father failed to attend administrative case reviews and a parent-child evaluation. He visited with his son only a dozen times in his life. SeeIn re Deana E., et al., 61 Conn. App. at 185. Bernard P. did not meet his son until Nino was 6 years old. Bernard P. did not request visits with Nino until the middle of 1999. His last visit with Nino was in September 2000. Bernard P. has never sent any cards, letters or gifts to or for his child and has not contacted DCF to inquire about Nino's well-being since August, 2001. Thus, Bernard P. has shown only sporadic interest in his child. Although he genuinely appeared to care about the welfare of the child, this interest does not amount to a reasonable degree of interest, concern or responsibility as to the child's welfare. In re Rayna M.,13 Conn. App., 23, 36, 534 A.2d 897 (1987). Thus the court finds that this ground has been established by clear and convincing evidence as to Bernard P.
C. Failure to Rehabilitate — § 17A-112(j)(3)(B)(i)
The Court finds that the petitioner has established by clear and convincing evidence that respondent fathers Gentress H. and Bernard P. have failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and special needs of the children, they could assume responsible positions in the lives of their children, who were adjudicated neglected on November 16, 1998 and, as to Elana, again on June 10, 1999.
"`Personal rehabilitation as used in [Section 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court . . . to find, by clear and convincing evidence, that the level of rehabilitation she CT Page 9579 has achieved, if any, falls short of that which would reasonably encourage a belief that [within a reasonable time] she can assume a responsible position in her child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999)]. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In reShyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165 (1999)]." In re SarahAnn K., 57 Conn. App. 441, 448, 749 A.2d 77 (2000). See also In re AshleyS., 61 Conn. App. 658, 665, 769 A.2d 718, cert. denied, 255 Conn. 950
(2001); In re Amneris P., 66 Conn. App. 377, 384-85, 784 A.2d 457
(2000).
The court finds by clear and convincing evidence that respondent Bernard P. has not achieved a sufficient degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and extreme special needs of the child, he could assume a responsible position in Nino's life. See In re Daniel C., 63 Conn. App. 354; In reAshley S., 61 Conn. App. at 665; In re Sarah Ann K.,57 Conn. App. at 448. As of the adjudicatory date, Bernard P. remained incarcerated. Although he was attempting to resolve his numerous pending charges, he did not know when he might be released. He had no plan for the care of Nino, other than to offer that he had a job waiting for him when he got out of jail as a carpet installer. He did participate in DOC substance abuse programs while incarcerated, but he had not participated in any parenting classes, let alone parenting classes that would address the needs of a severely traumatized child who had been subjected to neglect and sexual abuse. He candidly admitted that he knew as early as 2000 that he would have to complete parenting classes and be in a position to provide a stable home for his son, and he failed to do so. Indeed, he was reincarcerated such that he has spent much of Nino's life in custody. Moreover, Bernard P. demonstrated an inability to conform to the rules of his community work release at Connection House or supervised parole. Thus the evidence established, to a clear and convincing standard, that he does not have the ability to manage his own life, let alone the life of his child.
The court concludes by clear and convincing evidence, that as of the adjudicatory date of March 27, 2002, Bernard P. had not brought himself into a position in which he could provide adequate care for Nino. The court must also consider whether events after the adjudicatory date establish "a degree of rehabilitation that is sufficient to foresee that [respondent father] may resume a useful role in the child's life within a reasonable time." In re Stanley D., 61 Conn. App. 223, 230, 763 A.2d 83
(2000); In re Latifa K., 67 Conn. App. at 749-50 (acknowledging that the CT Page 9580 court could take facts into account from beyond the adjudicatory period in making its decision in the adjudicatory phase with regard to whether the degree of rehabilitation was sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time.) After the adjudicatory date, and up to the time of trial, respondent father remained incarcerated and was still not in a position to assume a useful role in the life of his son in view of Nino's special needs.
Rehabilitation must be foreseeable within a reasonable time. In reSheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001). "What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." In re Stanley D., 61 Conn. App. at 231
(quoting In re Michael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000)). In this case, Bernard P. agreed that it could be more than two years before he could parent Nino. Here, for an extremely troubled child who has never lived with his father and who has only seen his father about a dozen times in his life, the time necessary for sufficient rehabilitation even under the best of circumstances is not reasonable. As to Nino, he now has the stability of a wonderful foster home with his brother Mark and a foster mother who would like to adopt him. And in this case, rehabilitation itself remains speculative and contingent on respondent father's ability to remain crime-free after his release from the structure of incarceration, something respondent father has been unable to do since the time his son was born. Throughout the time his son was in DCF care, respondent father was unavailable to serve as a parent to him as a result of his criminal conduct. Thus, despite respondent father's professed love and concern for Nino, he has simply been unable to adequately parent Nino.
The court finds that respondent Bernard P. is not in a position to provide day to day care for his son Nino or to assume a useful role in his life and that he has not achieved rehabilitation as would encourage the belief that he will be in such a position within a reasonable time. Under the circumstances of this case, two years does not constitute a reasonable time for this child to wait for permanency. This is particularly so where the two years is contingent upon father continuing in recovery, remaining drug and crime-free, completing parenting classes and complying with the law.
As to respondent father Gentress H., he too has remained incarcerated. When he is released on special parole, it will include the condition that he have no contact with minors without permission as a result of his conviction for sexual molestation in 1990. Although he did complete DOC addiction related programs, he has not participated in any parenting classes while incarcerated, although this was identified as one of the specific steps for reunification. Particularly in view of Elana's extreme CT Page 9581 anxiety, nightmares, bedwetting and her need for constant reassurance, parenting classes were critical for Gentress H. Gentress H. argues that he successfully parented Elana for two months before his arrest in 1999. Although the evidence shows that he did have custody of Elana for those two months under an order of protective supervision, and that during that time no problems were reported regarding school, anxiety or bedwetting, his arrest in February and her immediate return to foster care clearly had a detrimental impact on her as reflected by her increased anxieties and her inability to trust that her father can care for her.
As to respondent father Gentress H. the court concludes by clear and convincing evidence, that as of the adjudicatory date of March 27, 2002, he had not brought himself into a position in which he could provide adequate care for Elana. The court must also consider whether events after the adjudicatory date establish "a degree of rehabilitation that is sufficient to foresee that [respondent father] may resume a useful role in the child's life within a reasonable time." In re Stanley D.,61 Conn. App. at 230; In re Latifa K., 67 Conn. App. at 749-50. In this case, as of the adjudicatory date, respondent had received a parole effective date of March 6, 2002 and he was awaiting a community release bed. His status was the same as of the date of trial. Thus, there were no particular circumstances after the adjudicatory date that established any greater degree of rehabilitation.
In assessing rehabilitation, "[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." In re Mariah S., 61 Conn. App. at 261; accord, In reGary B., 66 Conn. App. at 292; In re Amneris P., 66 Conn. App. 377,384-85, 784 A.2d 457 (2001). The issue is not whether respondent fathers Bernard P. and Gentress H. have improved their abilities to manage their own lives, but rather whether they have gained the ability to care for the particular needs of Nino and Elana. In re Shyliesh H.,56 Conn. App. 167, 180, 743 A.2d 165 (1999); In re Sarah Ann K.,57 Conn. App. at 448. Nino and Elana both have severe special needs, and will require at a minimum, therapy and medication for many years. Expressing love for the children and visiting with them is vastly different from being able to care for the particular special needs of these children on a day-to-day basis. Although Elana did have two months in the care of her father, both Elana and Nino have been in DCF care for most of their lives with relatively little interaction with their fathers.
As to Gentress H., the court also finds the time necessary for sufficient rehabilitation even under the best of circumstances is not reasonable. As of the date of trial, he was still incarcerated, awaiting a supervised parole community release bed, had not begun parenting CT Page 9582 classes and did not have stable housing or income to support Elana. In reSheila J., 62 Conn. App. at 479-80. The time necessary for Gentress H. to complete residential community release, begin and successfully complete parenting classes, and obtain stable housing and income is not reasonable under the circumstances of this case.
As Judge Brenneman stated in In re Samantha B., 45 Conn. Sup. 468,722 A.2d 300 (1997), aff'd, 51 Conn. App. 376, 721 A.2d 1255 (1998), "Terminating a parent's rights is not ordered to punish a parent who has not tried to rehabilitate; it is ordered so as not to punish a child by denying her a safe, permanent home with proven competent care-takers because her biological mother has tried hard but continues to be incapable of providing such a home for her." Here, respondents have tried to rehabilitate, but have done so insufficiently to be in a position to provide day to day care for either of these children within a reasonable time. Nino is now placed with his brother with a loving foster mother who is committed to him, with whom he has thoroughly bonded and who would like to adopt him. Similarly, Elana has finally found a pre-adoptive home which is able to meet her significant needs.
Thus, in its totality, the clear and convincing evidence compels the conclusion that respondent fathers Bernard P. and Gentress H. remain unable to successfully parent Nino and Elana and lack the ability to assume a responsible position in their lives within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved respondents' failure to achieve rehabilitation pursuant to § 17a-112 (j)(3)(B).
D. No Ongoing Parent-child Relationship — § 17A-112(j)(3)(D):
This ground is established when there is no ongoing parent-child relationship with the parent, which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing day to day basis the physical, emotional, moral and educational needs of the child and where allowing further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child.
No ongoing parent-child relationship contemplates "a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or [the child] has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645-46 (1980); In re John G., 56 Conn. App. 12,22, 740 A.2d 496 (1999). In any case, "the ultimate question is whether CT Page 9583 the child has no present memories or feelings for the natural parent." Inre Juvenile Appeal, (Anonymous), 177 Conn. 648, 670 (1979). The mere recognition of an individual as a parent will not defeat this ground. Inre Juvenile Appeal (84-6), 2 Conn. App. 705, 708-09 (1984), cert. denied, 195 Conn. 801 (1985). The presence or absence of positive feelings on the part of the child is determinative. In re Shane P.,58 Conn. App. at 240.
In the adjudicatory phase, the petitioner must establish (1) that no ongoing parent-child relationship exists; and (2) that the allowance of further time for the establishment of such a relationship would harm the interests of the child. In re Jonathan G., 63 Conn. App. 516, 525
(2001).
The Court finds by clear and convincing evidence that there is no ongoing parent-child relationship between Mark and Nino and respondent fathers John Doe and Bernard P., respectively. Respondent father John Doe has never seen his child Mark. Bernard P. has not seen Nino since September, 2000. Mark and Nino have been in DCF care approximately 5 1/2 years. During much of that time, respondent father Bernard P. was incarcerated as a result of his extensive criminal conduct. Bernard P. did not attempt to obtain visitation until 1999. John Doe has never sought visitation with Mark.
Certainly Mark would not recognize John Doe as a parent in that he would not seek comfort from him or go to him to have his needs met. Mark does not speak of his father, or express a desire to see him. Similarly, while Nino would recognize Bernard P. as his biological father, he would not seek comfort from him or go to him to have his needs met. Nino has had only limited visitation with Bernard P., visiting approximately 12 times in 1999 and 2000. He does not indicate any desire to see him or even to discuss any present memories of his biological father who has remained incarcerated. As set forth above, mere recognition of an individual as a parent will not defeat this ground. In re Juvenile Appeal(84-6), 2 Conn. App. at 708-09.
Although respondent father Bernard P. is well-intentioned to the extent that he expresses his love for his son and a desire to care for him when he can, the fact remains that he has not been a significant part of Nino's life since birth. As a result of his criminal conduct, which led to his lengthy incarcerations, respondent father Bernard P. has rendered himself unavailable to serve as a parent for Nino. See In re Shane P.,58 Conn. App. 234, 241 (2000). Even when he was not incarcerated, he did not make sufficient efforts to establish a parenting relationship with Nino, but instead, failed to attend administrative case reviews and reoffended, rendering him unavailable for his son. Neither respondent CT Page 9584 father John Doe nor Bernard P. have ever met, on a day to day basis, the physical, emotional, moral or educational needs of these children. In reJonathan G., 63 Conn. App. 525.
The court further finds by clear and convincing evidence that to allow respondent fathers further time for the establishment of a parent-child relationship with Mark and Nino, would be detrimental to the best interest of the children. They are now 11 and 10 years old and suffering from the effects of having been physically and sexually abused. They are in the same wonderful foster home they have lived in together for over a year and where Mark has lived for approximately three years.
Both boys have extreme special needs and both are in grave need of stability and permanency. As Mr. Ramirez testified, the stability they have found with their foster mother has allowed them to make great progress. Bernard P. himself even testified that he did not want to take Nino out of a good environment and place him into an unstable environment. Based on Mark and Nino's needs, the court finds by clear and convincing evidence that it would be detrimental to them to allow any further time in which respondent fathers could attempt to develop a parent-child relationship.
Thus, the Court finds that the petitioner has proven this statutory ground for termination as to respondent Bernard P. and John Doe by clear and convincing evidence.
III. DISPOSITION
As to the dispositional phase of this hearing on the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events up to and including April 30, 2002, the date upon which the evidence in this matter was completed.[6] With respect to the seven written factual findings required by C.G.S. § 17a-112 (k), each of which the court has considered in determining whether to terminate parental rights under this section, the court makes the following findings:
(1) As to the timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with respondent, the court finds by clear and convincing evidence that services, including visitation, were offered during some of the time the children were in DCF care. At other times, as set forth above, services were not offered due to respondents' incarceration and/or the child's fragile state. Further, Bernard P., Gentress H., and John Doe were unable to benefit from reunification efforts. CT Page 9585
(2) As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, the court finds by clear and convincing evidence that reasonable efforts were made and that Bernard P., Gentress H. and John Doe (through his non-appearance) have demonstrated that they are unable or unwilling to benefit from reunification efforts. C.G.S. § 17a-112
(j)(1).
(3) As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, the court finds that specific steps were ordered as to respondent fathers Gentress H. and Bernard P., some of which were complied with and some of which were not as set forth fully above at pp. 9-12. DCF has fulfilled any obligations it had in order to facilitate reunification of the family. Because John Doe has not appeared, no orders were entered as to him.
(4) As to the feelings and emotional ties of the children with respect to their parents, any guardian, and any person who has exercised physical care, custody or control of them for at least one year and with whom they have developed significant emotional ties, the court finds that Mark and Nino have an emotional bond with their mother. Mark does not have an emotional bond with his unknown father John Doe. He has a very strong emotional bond with his foster mother and his brother who lives with him.
Nino does not have a strong emotional bond with respondent father Bernard P. Although he recognizes that Bernard P. is his biological father, he does not know him as a parent having only met him at the age of six and seeing him approximately a dozen times in 1999-2000. He has not seen him since September 2000. Like Mark, Nino has a very strong emotional bond with his foster mother, who has provided wonderful care and consistent guidance for the boys. Significantly, the boys have a very strong bond with each other.
Elana does not have a strong emotional bond with her biological mother. She knows her mother is not able to care for her. Elana knows Gentress H. is her biological father and recognizes him as such, however, she does not have a strong emotional bond with him and does not consider him as a psychological parent. She does not ask about him or express a desire to see him. She asks far more often when she will be adopted. Although Elana lived with Gentress H. for approximately two months following a number of foster placements and a return to her mother, he has not been a significant part of her life. Indeed, his arrest and conviction shortly after she moved in with him, added to her CT Page 9586 insecurity and anxiety. She is confused about his ability to care for her and has extreme anxieties about how he could care for her. She has a strong bond with her preadoptive foster mother who is meeting all of her physical, educational, moral and emotional needs. She would like to be adopted by her preadoptive family.
(5) As to the ages of the children, the court finds that Mark is 11, Nino is 10 and Elana is 8. The Court further finds, as shown by clear and convincing evidence, that these children require stability of placement and continuity of care and that the children's attorney recommends termination.[7]
(6) As to the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; the court finds by clear and convincing evidence that respondent father John Doe has not attempted to establish contact with Mark or DCF. Respondent father Bernard P. has had some contact with Nino which has been limited in part due to his incarceration, his conduct while released, and also due to the fact that Bernard P. did not take any responsibility for Nino or even meet him until he was six years of age. Respondent father Gentress H. has had contact with Elana, and has made efforts to resume visitation, which has been limited due to Elana's anxiety and her fragile state, the extent of the trauma she experienced, and his incarceration. Gentress H. also had no involvement with Elana during the first few years of her life.
(7) As to the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds by clear and convincing evidence that no unreasonable conduct by the child protection agency, the mother, or foster parents is noted. Respondent fathers' own conduct was on balance the overriding factor in their inability to maintain a meaningful relationship with their children. Further, economic factors did not prevent regular, continuing contact with the children.
With respect to the best interests of the child contemplated by C.G.S. § 17a-112 (j)(2), by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental CT Page 9587 rights of Maria I., Bernard P., Gentress H. and John Doe is in the best interest of the children. These findings are made after considering the totality of circumstances including the children's sense of time and the children's need for a secure and permanent environment. Mark, Nino and Elana have been in DCF care for much of their young lives. When they were not in care, they suffered severe abuse and neglect. Respondent fathers were not available for their children when they needed them. Permanency, consistency and stability are crucial for Mark, Nino and Elana. While respondent father Gentress H. and Bernard P. love their children and desire to care for them, they have been consistently unable to assume a responsible parental role given the complex problems and special needs of these children. The evidence shows that they are unable to manage their own lives, let alone provide day to day care for Elana and Nino, respectively. The Court again acknowledges the quality of care that Elana is receiving in her foster home and that Mark and Nino are receiving together in their foster home which is able to address their specialized needs. The court notes the boys' strong attachment not only to their foster mother, but also to each other.
The court also finds that term nation of the parental rights of respondent mother, Maria I. to Mark, Nino and Elana based on mother's consent is in the best interest of the children. Respondent mother voluntarily consented to termination in recognition of her own struggles and out of love for her children, in view of the stability, consistency, commitment, and permanency offered for her children. This finding is made after considering the totality of circumstances including the children's sense of time and the children's need for a secure and permanent environment.
It is accordingly, ORDERED that the parental rights of Maria I. and John Doe are hereby terminated as to the child Mark W., the parental rights of Maria I. and Bernard P. are hereby terminated as to the child Nino I., and the parental rights of Maria I. and Gentress H. are hereby terminated as to the child Elana H. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent of Mark W., Nino I. and Elana H. for the purpose of securing an adoptive family or other permanent placement for the children.
A permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court as required by law.
Judgment may enter accordingly.
It is so ordered this 31st day of July, 2002. CT Page 9588
Jongbloed, J.