MEMORANDUM OF DECISION
This memorandum of decision addresses a petition brought to terminate the parental rights (TPR) of Vicki L.[2] the biological mother of Alyssa B., born September 1, 2000.[3]
The Department of Children and Families (DCF) filed a TPR petition on July 6, 2001, alleging the grounds of abandonment, failure to achieve rehabilitation, and lack of an ongoing parent-child relationship. For the reasons stated below, the court finds these matters in favor of the petitioner.
Trial of this highly-contested matter took place on August 26 and October 28, 2002. The petitioner, the minor child and the respondent mother were vigorously represented throughout the proceedings.[4] The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over the pending case. Notice of this proceeding has been provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of Alyssa.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social study,[5] and the multiple other documents submitted in evidence which included Connecticut and Massachusetts court records, correspondence from the respondent, and a course completion certificate. The court has utilized the applicable legal standards[6] in considering this evidence CT Page 1844-b and the testimony of trial witnesses, who included DCF staff members, the foster mother, and Vicki L.[7] Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial.[8]
 I.A. HISTORY OF THE PROCEEDINGS
Alyssa was born to Vicki L. and Stephen B. on September 1, 2000. DCF has had custody of the child since September 5, 2000 when the court (Driscoll, J.) imposed an ex parte OTC; the OTC was confirmed on September 15, 2000. (Exhibits 1, 3.) On October 3, 2000, the court (Driscoll, J.) found the child to be homeless as Vicki L. was confined at York Correctional Institute (YCI) and Stephen B. was incarcerated in Massachusetts. Adjudicated an uncared-for child, Alyssa was committed to the custody of DCF; she has remained in DCF custody ever since. (Exhibits 4, 5.)
 I.B. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF OCTOBER 3, 2000.
Vicki L. was born on May 10, 1972. Her mother used heroin; her father used drugs and died of a heroin overdose when Vicki L. was fifteen years old. At the age of five, Vicki L. came into the care of her maternal grandparents. (Exhibit 1.) Vicki L. has earned her GED; presently incarcerated, she takes computer classes and works as a cottage cleaner. (Testimony of Vicki L.)
Vicki L. first tried marijuana and alcohol when she was fifteen years old. At that time, she became involved with Harold P. Their child Kristen was born on March 11, 1989, when Vicki L. was sixteen years old. (Exhibit 1.)
Vicki L. continued to use alcohol regularly, and also used marijuana. In the fall of 1992, Vicki L. was involved in a fatal motor vehicle accident in Massachusetts. She was arrested and charged with operating a motor vehicle without a license, unauthorized use of a motor vehicle, giving a false name to a police officer, leaving the scene after causing personal injury, manslaughter and homicide with a motor vehicle.[9] Vicki L. was held in lieu of bail awaiting trial. (Exhibit 2.) Since that time, Vicki L.'s first child, Kristen has been cared for by members of her family. (Exhibit 1; Testimony of Vicki L.)
On October 6, 1993, Vicki L. pled guilty to her pending charges in Massachusetts. She was sentenced to fifteen to twenty years of incarceration with ten years to be served, and commenced serving CT Page 1844-c her sentence at that time.[10] (Exhibit 2.) During the ensuing period of incarceration, Vicki L. took numerous programs including stress class, fitness class, Reasoning and Rehabilitation class and HIV class.[11] (Testimony of Vicki L.)
In March 1998, Vicki L. was released from prison. The remainder of her sentence was suspended, and she began a period of probation. As a condition of her probation, Vicki L. was directed to participate in alcohol counseling. (Exhibit 2; Testimony of Vicki L.)
Upon her release from incarceration, Vicki L. lived with her mother for a few months. She then became involved with Stephen B., and again used heroin and marijuana on a fairly regular basis. (Exhibit 1; Testimony of John L.) During this period, Vicki L. allowed and permitted herself to be present "when somebody was doing a B and E."[12] (Testimony of Vicki L.) She thereby violated the terms of her probation and subjected herself to a new arrest in Massachusetts. (Testimony of Vicki L.) Thereafter, Vicki L. moved to Connecticut to avoid arrest in Massachusetts. Pregnant with Alyssa, the respondent mother continued using heroin at least through December 1999. (Exhibit 1; Testimony of John L.)
On January 24, 2000, the Commonwealth acknowledged that Vicki L. had defaulted her probation, and ordered a warrant for her arrest. (Exhibit 2; Testimony of John L.) Vicki L. was apprehended in Connecticut, and was detained at YCI awaiting extradition to Massachusetts.
Vicki L.'s second child, Alyssa, was born at a local hospital on September 1, 2000. The child briefly received treatment in the hospital's intensive care unit, and was taken into DCF custody upon discharge, as Vicki L. could not care for the child while incarcerated. The infant was placed in temporary foster care with Susan and Stanley B. (Exhibit 1.) DCF brought Alyssa to visit with her mother at YCI on October 2, 2000. (Exhibit 2; Testimony of John L., Vicki L.) As Vicki L. remained incarcerated, Alyssa was adjudicated an uncared for child on October 3, 2000 and was committed to DCF. (Exhibits 4, 5.)
 I.C. EVENTS FOLLOWING THE ADJUDICATION OF OCTOBER 3, 2000.
In late October 2000, after ninety days of detention at YCI, CT Page 1844-d Vicki L. was returned to Massachusetts to face her pending charges. She has remained incarcerated in Massachusetts, completing the sentence originally imposed in 1993. (Exhibit 2; Testimony of John L., Vicki L.)
On December 7, 2000, DCF brought Alyssa to visit Vicki L. at her place of incarceration in Massachusetts. Thereafter, DCF made repeated, unsuccessful attempts to communicate with Vicki L.'s counselor at the Massachusetts Department of Correction (MDOC) to arrange additional supervised visits between Vicki L. and Alyssa.[13] Alyssa must be transported for approximately two hours, each way, in order to visit with her mother in Massachusetts. (Exhibits 1, B; Testimony of John L., Carolyn W.)
 I.D. EVENTS FOLLOWING THE FILING OF THE TPR PETITION OF JULY 6, 2001.
As found in Part I.A., the TPR petition was filed against Vicki L. on July 6, 2001. On August 16, October 11 and December 11, 2001, DCF brought Alyssa to Massachusetts for visits with Vicki L. at her place of incarceration in Massachusetts. (Testimony of John L., Carolyn W.)
In the fall of 2001, Vicki L. participated in the Correctional Recovery Academy, an intensive six-month program sponsored by MDOC. On October 12, 2001, she received a certificate indicating that she had successfully completed the program.[14]
Thereafter, she participated in MDOC's two-month Graduate Maintenance Class, and she now receives one hour of counseling from time to time to reinforce the life management skills she has learned. At her place of incarceration, Vicki L. participates in computer training in prison and she works as a cottage cleaner. She attends AA meetings once or twice a week, and has been referred for parenting classes sponsored by the MDOC. (Exhibits 1, C; Testimony of Vicki L.)
In early November 2001, one-year-old Alyssa was hospitalized for vomiting and dehydration. Diagnosed with Juvenile Diabetes, she was treated in the intensive care unit. Upon discharge, Alyssa was placed in residence with Ann and her husband, who were available to provide more extended foster care. Ann and her husband have received training and are skilled in determining how much insulin Alyssa requires, administering the child's insulin injections, ascertaining how much food the child should eat, and how to watch for complications in her condition. Although Alyssa CT Page 1844-e will always be insulin dependent, her condition has been quite stable under her foster parents' care. (Testimony of Ann.)
Now a toddler, Alyssa is happy and well adjusted to life with Ann, her husband, and their eleven-year-old son, who adores his foster sister. Alyssa is beginning to learn to talk; she calls her foster parents "mommy" and "daddy." Ann and her husband would love to adopt Alyssa if she becomes available to them. (Testimony of Ann.)
Vicki L. had no visits with Alyssa from January 2002 through June 2002.[15] Commencing in July 2002, Alyssa has been transported by DCF for one-and-a-half hour visits with Vicki L. each month, at her place of incarceration in Massachusetts. During these visits, the respondent mother has been very appropriate with Alyssa. (Testimony of Carolyn W., Daniel S.) Alyssa is Vicki L.'s only visitor. (Testimony of Vicki L., Carolyn W.)
While Vicki L. hopes to be discharged from prison by the end of 2003, she admits that she is subject to a maximum incarceration date that does not expire until 2005. (Testimony of Vicki L., Carolyn W.) When she is released, Vicki L. wants to attend an unspecified program that could also accommodate Alyssa. (Testimony of Vicki L.)
 II. ADJUDICATION
In the adjudicatory phase of this hearing,[16] the court has considered the evidence related to circumstances and events prior to July 6, 2001, the date upon which the TPR petition against Vicki L. was filed, insofar as the allegations pertaining to abandonment and lack of an ongoing parent-child relationship are concerned.[17] With regard to the allegations of failure to achieve rehabilitation, the court has considered the evidence and testimony related to circumstances occurring through the close of trial.[18] Upon review, as discussed below, the court has determined that statutory grounds for termination exist as to the respondent mother.
 II.A. LOCATION AND REUNIFICATION EFFORTS
It is axiomatic that "[b]efore a court may grant a petition to terminate parental rights on the basis of a parent's failure to achieve a sufficient degree of personal rehabilitation, the court CT Page 1844-f must find by clear and convincing evidence that the department has made reasonable efforts to reunite the child with the parent. General Statutes (Rev. to 1999) § 17a-112(c)(1), now (j)(1)."[19] In re Amneris P., 66 Conn.App. 377, 386,784 A.2d 457 (2001). "In accordance with [§ 17a-112(j)(1)], the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate." (Citation and quotation marks omitted.) In re Ebony H., 68 Conn.App. 342, 348,789 A.2d 1158 (2002). Here the court finds that the petitioner has met her burden of proving by clear and convincing evidence that a judicial determination was made on February 6, 2001 establishing that such efforts were not appropriate.[20] In re EbonyH., 68 Conn.App. 342, 348. (Exhibits 6, 8.) The court further finds by clear and convincing evidence that the reunification efforts made by DCF were reasonable given Vicky L.'s out-of-state incarceration. In addition, based on the clear and convincing evidence produced at trial, the court now finds that given her long-term incarceration, Vicki L. is either unable or unwilling to benefit from the reasonable reunification efforts contemplated by § 17a-112(j)(1).
Vicki L.'s long-term incarceration in Massachusetts has virtually extinguished DCF's opportunities to provide §17a-112(j)(1) reunification services.[21]
(Testimony of Carolyn W.) Under these circumstances, Vicki L. must be seen as effectively unable to participate in or benefit from those reasonable efforts at reunification that are contemplated by §17a-112(j)(1). Nonetheless, although it was not obligated to do so, DCF did provide some visitation for Vicky L. during the course of her incarceration.[22] These visitation services were reasonable given the totality of the circumstances in this case, which reflect Alyssa's young age and the lengthy trip required to transport the child to prison visits; DCF's difficulties in establishing contact with Vicky L.'s prison counselor; the child protection agency's lack of staff reasonably requisite to conducting increased out-of-state visitation; and the absence of any court orders imposing a visitation mandate upon the department, relative to this case.
While Vicki L. protests that DCF cannot be found to have made reasonable efforts at reunification because she did not receive an adequate amount of visitation with her child, the clear and CT Page 1844-g convincing evidence impels the contrary determination. As found in Part I.D., during the initial part of Vicki L.'s confinement in Massachusetts, DCF made reasonable efforts to contact prison staff members who could coordinate visits from Alyssa. However, those efforts were unsuccessful from late 2000 through April 2001.[23] (Testimony of John L., Carolyn W.) Despite the length of the trip involved, DCF transported young Alyssa to three visits in Massachusetts from April 2001 through December 2001. However, due to the burdensome trip involved, it became apparent that adjuvant staff would be required to assist DCF in facilitating prison visits. Unfortunately, for some time, DCF lacked the resources necessary to assign a case aide who could provide the necessary inter-state transportation. Commencing in the summer of 2002, DCF was able to supply a case aide who could drive Alyssa to see her mother at the prison in Massachusetts and thereafter regular, monthly visits were voluntarily extended by the agency. (Testimony of John L., Carolyn W.)
While DCF is often under a duty to provide visitation in child protection matters, no steps, other court orders or legal precept mandated the department to make out-of-state visitation with Alyssa available for the respondent mother.[24] In this matter, although Vicki L. was apparently dissatisfied with DCF's visitation schedule, there is insufficient evidence from which the court could ascertain the specific nature or extent of visitation services that the respondent mother expected from the department.[25] The file is void of motions from Vicki L. requesting a court hearing for consideration of the visitation issue.[26] Furthermore, there was insufficient evidence from which the court could conclude that Vicki L. ever addressed her concerns over the visitation issue through an administrative hearing, as is contemplated by Regs., Conn. State Agencies § 17a-14-1 et seq.
In assessing the reasonableness of DCF's reunification efforts in this case, the court has remained mindful that it was Vicki L.'s own repeated unlawful conduct, as described in Parts I.B. and C., that caused her to be incarcerated in another state, and therefore separated from her daughter. Even if it is determined that the court's February 2001 ruling did not relieve DCF of its obligation to provide reunification efforts in this case, the department would only be obligated to extend such efforts as were reasonable given the respondent mother's out-of-state imprisonment; the agency was not required to extend every possible reunification service. In re Mariah S., supra,
CT Page 1844-h61 Conn.App. 255. Upon careful, objective consideration of the circumstances of this case, it is clearly and convincingly apparent that DCF's reunification efforts were reasonable in nature, given the respondent mother's lengthy imprisonment in Massachusetts.[27] In re Hector L., supra,53 Conn.App. 372; see also In re Roshawn R., supra, 51 Conn.App. 56-57. The clear and convincing evidence establishes that the efficacy of DCF's reunification was not limited by any unreasonable conduct of the department. Rather, those efforts were fundamentally thwarted by Vicki L.'s unlawful conduct which had led to her reincarceration before her daughter's birth in 2000, and which has led to her continuous imprisonment in an out-of-state facility.[28] In re Amelia W., 62 Conn.App. 500, 506,772 A.2d 619 (2001); see In re Ebony H., supra, 68 Conn.App. 350.
As the clear and convincing evidence establishes that DCF provided Vicki L. with the visitation services that were appropriate to the circumstances, the agency fulfilled any obligation it may have had to make reasonable efforts to reunify the respondent mother with her daughter, under the circumstances of this case. The clear and convincing evidence further establishes that Vicki L.'s out-of-state imprisonment renders her unable to benefit from reunification services. As the court had previously ruled that reunification efforts were no longer appropriate, the petitioner has met her burden of proof under §17a-112(j)(1).
 II.B. STATUTORY GROUNDS FOR TERMINATION II.B.1. ABANDONMENT — § 17a-112(j)(3)(A)
The petitioner first alleges that Vicki L. abandoned Alyssa within the meaning of § 17a-112(j)(3)(A).[29] Vicki L. argues that because she has remained interested in and concerned about her daughter, the petitioner cannot prevail on this ground. Applying the requisite legal standards[30] and construing the statute in accordance with § 17a-112(p),[31] the court finds this matter in favor of the petitioner.
A review of the clear and convincing evidence related to Vicki L.'s conduct reveals that from October 3, 2000 through July 6, 2001, this respondent failed "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . ." In re Deana E., supra, 61 Conn.App. 193. It is true that on the infrequent occasions that Vicki L. contacted DCF CT Page 1844-i since her transfer from YCI to Massachusetts, the respondent mother has always inquired about Alyssa's well being.[32]
(Testimony of Carolyn W.) However, those contacts were sporadic in nature, and do not demonstrate the valid showing of concern for the child contemplated by § 17a-112(j)(3)(A). In re DeanaE., 61 Conn.App. 193. Even though Vicki L.'s out-of-state imprisonment has necessarily limited her opportunities for visiting with Alyssa, the respondent mother has failed to use other available means of maintaining contact with the child. She has failed to send any cards or letters to Alyssa, events that would have provided the DCF social worker and Alyssa's foster mother with meaningful opportunities to inform the child of these demonstrations of affection.[33] Vicki L. has not sent the child any gifts because she cannot purchase them while in prison. (Testimony of Vicki L.) Due to the fact that she has been incarcerated during each day of young Alyssa's life, Vicki L. has never supplied Alyssa with the food, clothing and medical care that is necessary for her safe existence; she has never provided a home for Alyssa; and she has never used any form of communication to assist in furnishing the child with social or religious guidance. See In re Deana E., supra,61 Conn.App. 185, 193.
Whether the adjudicatory date of July 6, 2001 or date of the close of trial is applied, the evidence in this matter clearly and convincingly establishes that Vicky L. has failed the test of meeting "[t]he commonly understood obligations of parenthood" identified in In re Deana E., supra, 61 Conn.App. 193. Accordingly, based on clear and convincing evidence presented in this case, the court finds that the petitioner has met her burden of proving that Vicki L. has abandoned Alyssa, within the meaning of § 17a-112(j)(3)(A).
 II.B.2. PARENTAL FAILURE TO REHABILITATE — § 17a-112(j)(3)(B)
The petitioner next alleges that Vicki L.'s parental rights should be terminated because she has failed to achieve rehabilitation within the meaning of §17a-112(j)(3)(B)(i).[34] Vicki L. counters that she has done well during her most recent period of incarceration, has become educated, and has made sufficient progress in rehabilitation to resume a responsible role in Alyssa's life. As Alyssa was found to be uncared for on October 3, 2000, the critical issue for this court is whether the respondent has achieved rehabilitation in the statutory sense. Applying the CT Page 1844-j requisite legal standards[35] and construing the statute in accordance with § 17a-112(p), the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case compel the conclusion that Vicki L. has yet to achieve a sufficient degree of rehabilitation as would encourage the belief that at some reasonable date in the future she could assume a responsible position in Alyssa's life. See In re Daniel C.,63 Conn.App. 339, 354, 776 A.2d 487 (2001); In re Ashley S.,supra, 61 Conn.App. 665; In re Sarah Ann K., supra,57 Conn.App. 448. First, as found in Part I.B., the evidence clearly and convincingly establishes that Vicki L. has been incarcerated for over two years. She will remain incarcerated, subject to MDOC control, for many more additional months, and is subject to remain imprisoned for nearly two more years.[36]
(Exhibit A; Testimony of Vicki L.) As a practical matter, for so long as she remains imprisoned in Massachusetts or otherwise under MDOC custody, Vicky L. will lack the capacity to serve as a responsible parenting resource for her daughter, as she will not be available to meet the child's particular needs, including her need for continuous physical supervision and medical support.[37] During her incarceration, Vicki L. will not physically be present to assist Alyssa in learning to develop her own valid set of life skills, and she will be manifestly unable to provide her with the consistent nurturing emotional support the child requires for healthy growth and development.
Moreover, as found in Part I., Vicki L. has spent nearly all of her adult life in a prison setting. Unfortunately, she has never exhibited the ability to make healthy judgments when choosing her own environment or companions, and has not manifested the ability to live free from the involvement of law enforcement agencies. Released from incarceration in March 1998 at the age of twenty-six, Vicki L. returned to live with her mother, who had abused heroin in the past and who had abandoned her as a child, leaving her to the care of her grandparents. Vicki L. started using drugs, even though she had been imprisoned for over five years as the result of her own drunken driving, and although she had taken a variety of classes while incarcerated in an effort to learn how to live a healthy lifestyle. Within a matter of months after her release from incarceration, Vicki L. caused or allowed herself to be present at the scene of a burglary, violating her probation in the state of Massachusetts. She fled to Connecticut to escape prosecution for both offenses, but was apprehended, and CT Page 1844-k has been incarcerated since the summer of 2000 addressing the new charges that had been brought against her by the Commonwealth.
These poor judgments, made so soon after a lengthy period of incarceration, do not bode well for Vicki L.'s ability to make appropriate decisions for herself, let alone for a child in her care, once she is finally released from MDOC's supervision. It is well-settled that "in assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue."In re Daniel C., supra, 63 Conn.App. 353. See also In reAmneris P., supra, 66 Conn.App. 384-85; In re Ashley S.,supra, 61 Conn.App. 665; In re Sarah Ann K., supra,57 Conn.App. 448. Other than the gentle, caring manner that Vicki L. exhibits during her monthly meetings with Alyssa, however, there is absolutely no evidence from which the court could infer that during her most recent period of incarceration the respondent mother has gained the ability to appropriately care for her very young daughter.
Overall, the clear and convincing evidence as a whole reflects that Vicki L. is simply unavailable to care for her child at present, and that she is not likely to be available to serve as a caretaker in the foreseeable future, given her obligations to the MDOC and her inability or unwillingness to satisfactorily apply any of the life skills she may have learned during prison programs.[38] When Vicki L. is finally placed on parole or otherwise discharged from the prison system in Massachusetts, she will have another opportunity to demonstrate whether she can live in a lawful manner. However, given Alyssa's age and absolute need for medical care and attention to her daily needs, it would be unreasonable and inappropriate to require her to wait for Vicki L.'s release from incarceration, when her parenting capacity could be assessed from the standpoint of her ability to live appropriately in the community. This child, who has lingered in foster care for so long, "should not be further burdened by having to wait for her mother to achieve the level of competency necessary to parent her" before she is permanently placed in a stable, secure, and loving home. In re Amneris P., supra,66 Conn.App. 385.
Based on all the facts presented in this case, the court finds that Vicki L.'s rehabilitation is not foreseeable within a reasonable time. In re Daniel C., supra, 63 Conn.App. 353. In CT Page 1844-l reaching this conclusion, the court has analyzed the respondent mother's relative lack of present rehabilitation as it relates to Alyssa's particular needs for a responsible parent who can provide her with adequate physical care, emotional stability, security, and consistency. Even if Vicki L. should now successfully engage in rehabilitation and develop the ability to live in a lawful manner outside a prison setting, those efforts would be "too little and too late" for Alyssa given the two years and four months that have passed since her adjudication as an uncared for child in October 2000. In re Sheila J.,62 Conn.App. 470, 481-82, 771 A.2d 244 (2001).
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite some participation in a rehabilitation regimen, Vicki L. remains without the qualities necessary to successfully parent Alyssa and lacks the ability to assume a responsible position in her life within a reasonably foreseeable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved Vicki L's failure to achieve rehabilitation pursuant to § 17a-112(j)(3)(B).
 II.B.3. LACK OF ONGOING PARENT-CHILD RELATIONSHIP — § 17a-112(j)(3)(D)
The petitioner next alleges that no ongoing parent-child relationship exists between Vicki L. and Alyssa, and that the child's best interests will not be served by allowing additional time for this relationship to be developed, so that the TPR petition should be granted pursuant to General Statutes §17a-112(j)(3)(D).[39] Vicki L. argues that she has maintained contact with the child to the best of her ability, so that the petitioner cannot prevail on this ground. Applying the requisite legal standards, and construing the statute in accordance with § 17a-112(p), the court finds this matter in favor of the petitioner.
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between the respondent mother and her daughter.[40] In re Jonathon G.,supra, 63 Conn.App. 525. Examining the totality of the clear and convincing evidence in this case,[41] it is apparent that no such relationship exists, as Vicki L. has not met her daughter's emotional, moral and educational needs, factors specified in § 17a-112(j)(3)(D), either prior to the filing of CT Page 1844-m TPR on July 6, 2001 or at any time thereafter.[42] Id. As a practical matter, Vicki L.'s current imprisonment has rendered her unable to meet these needs, despite her sincere love for her daughter.
The clear and convincing evidence also reflects that although Vicki L. has vigorously contested the petitioner's efforts to terminate her parental rights, she has done little to effectuate a bond with Alyssa. During their few visits, Vicki L. has met some of the child's emotional needs. She speaks to Alyssa in a soft and gentle manner, and handles her in a loving way. However, due to Vicki L.'s long-term imprisonment, the respondent mother has not fulfilled any of other relevant § 17a-112(j)(3)(D) criteria in any sustained sense. The respondent mother has not meaningfully attempted to commemorate the child's birthdays and holidays, and she has elected not to send cards or tokens that could reasonably have been used, during Alyssa's formative years, as memorializations of Vicki L.'s affection for her daughter.
Vicki L. may claim that any lack of an ongoing parent-child relationship is attributable to DCF's failure to provide consistent visitation, as fully discussed in Part II.A. Such argument must be rejected in this case, as in In re Shane P.,58 Conn.App. 244, 256, 754 A.2d 169 (2000). Because she has been serving her lengthy sentence, Vicki L. has never developed with Alyssa the type of relationship that ordinarily develops as a result of a parent having met her child's physical, emotional, moral or educational needs on a day-to-day basis. §17a-112(j)(3)(D). The evidence affirmatively establishes that the lack of a parent-child relationship in this case is directly attributable to Vicki L.'s own involvement in criminal activity following her release from prison in March of 1998. It was her presence at the scene of a crime in Massachusetts, her subsequent flight from that state, the ensuing criminal charges brought against her by the Commonwealth, and her apprehension and imprisonment thereafter which in effect rendered her unavailable to serve as a parent for Alyssa. See In re Shane P., supra,58 Conn.App. 241. Here, then, "the respondent's behavior, not the conduct of the department, prevented the development of a relationship with [her daughter]." In re Amelia W., supra,62 Conn.App. 506. See also In re Deana E., supra,61 Conn.App. 193.
In discerning whether a parent-child relationship exists, the court must also determine whether Alyssa has any present memories CT Page 1844-n or feelings for Vicki L. and, if so, whether those feelings are of a positive nature.[43] In re Jonathon G., supra.63 Conn.App. 525. Although Alyssa has visited with Vicki L. on several occasions, the child does not have any positive, or negative, feelings for her biological mother. Although she recognizes and willingly engages in play with the respondent, Alyssa does not approach Vicki L. looking for hugs or affection.[44] In contrast, after the visits end, she runs to her foster mother and is happy to see her. (Exhibit 1; Testimony of Daniel S.) The clear inference is that to Alyssa, Vicki L. may be a known adult companion, but she does not occupy, fulfill, or play a maternal role in the child's life, and she is not subject to any maternal feelings from the child. Alyssa has a visiting and biological relationship with the respondent mother, but nothing more.
Vicki L. may argue that because Alyssa was removed from her custody shortly after her birth, she is protected from claims brought pursuant to § 17a-112(j)(3)(D) through the principles discussed in In re Valerie D., 223 Conn. 492, 499, 613 A.2d 748
(1992). However, noting that the circumstances of Vicki L.'s imprisonment at YCI in September 2000 and her then-impending extradition for continued imprisonment in Massachusetts, the court is constrained to conclude that Valerie D. does not apply to the present case. Valerie D. is based upon compelling factual circumstances supporting the conclusion that DCF's early intervention in that child's life had, in and of itself, served as the death knell for that parent's efforts to develop a relationship with her child. Those circumstances are absent in the present case, where Vicki L.'s protracted incarceration caused, allowed or permitted the absence of any ongoing parent-child relationship with Alyssa. See In re Antwoine D.,
Superior Court for Juvenile Matters, Child Protection Session (N. Rubinow, J.; April 2, 2001).
As it is thus apparent that no parent-child relationship exists between Vicki L. and Alyssa, the court is next called to assess whether it would be detrimental to the child's best interests to allow additional time for a parenting relationship to be developed with the respondent mother. In re Jonathon G., supra,63 Conn.App. 525. As found in Part II.B., due to her obligations to the DOC, Vicki L. will not be available to serve as a caretaking parent for Alyssa in the reasonably foreseeable future. Even after she is released from prison, Vicki L.'s past history of poor judgment regarding use of illegal drugs and CT Page 1844-o choice of companions does not bode well for her ability to provide a safe and stable environment in which Alyssa would live if returned to her care. See In re Michael D.,58 Conn.App. 119, 124-25, 752 A.2d 1135, cert. denied, 245 Conn. 911,759 Conn. 505 (2000).[45] Furthermore, as fully discussed in Part III.B., Alyssa is happy, comfortable and healthy in her current foster home, where her special medical needs are well attended to.[46] Under all these circumstances, it is clearly and convincingly established that the child's best interests will not be served by requiring her to wait until Vicki L. has achieved the ability to serve as Alyssa's caretaker, before providing her with a permanent parenting resource.
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." (Citations omitted.) In re John G., 56 Conn.App. 12, 22,740 A.2d 496 (1999). Such construction is applicable to the present case, where the clear and convincing evidence establishes that any valid parenting relationship that Vicki L. may have developed with Alyssa has been definitively lost due to her obligation to serve her sentence of incarceration in Massachusetts. As the clear and convincing evidence in this case establishes that no ongoing parent-children relationship exists between Vicki L. and Alyssa, and that it is not in the best interests of the child to allow more time for her to develop a relationship with her biological mother, the petitioner has met her burden of proof under § 17a-112(j)(3)(D). In re Jonathon G., supra,63 Conn.App. 525; In re John G., supra, 56 Conn.App. 22.
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child."[47] (Citation and quotation marks omitted.) In re Quanitra M., supra,60 Conn.App. 103; see also In re Valerie D., supra, 223 Conn. 511
and n15. In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
 III.A. SEVEN STATUTORY FINDINGS CT Page 1844-p
The court has made each of the seven written factual findings required by General Statutes § 17a-112(k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights. See In re Jonathon G.,63 Conn.App. 516.
 III.A.1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(k)(1)
As found in Part II.A., reasonable visitation services were provided for Vicki L. Provision of other services was unwarranted in this case given Vicki L.'s consistent incarceration in Massachusetts, and the court order entered on February 6, 2001 and reiterated on September 25, 2001, establishing that further reunification efforts were no longer appropriate.
 III.A.2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — § 17a-112(k)(2)
Under the circumstances of this case, in which Vicki L. was subject to long-term incarceration in Massachusetts, DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, through the provision of the visitation services identified in Parts I. and II.A. Furthermore, as found in Part III.A.1., the court had previously ruled that further reunification efforts were inappropriate.
 III.A.3. COMPLIANCE WITH COURT ORDERS — § 17a-112(k)(3)
No applicable court orders were in effect for Vicki L.
 III.A.4. THE CHILD'S FEELINGS AND EMOTIONAL TIES — § 17a-112(k)(4)
As found in Part II.B.3., Alyssa is relatively comfortable in Vicki L.'s company. However, she is very well adjusted in her foster home, calls her foster parents "mommy" and "daddy," and looks to them for comfort.
 III.A.5. AGE OFTHE CHILD — § 17a-112(k)(5)
Alyssa was born on September 1, 2000; she is just over two CT Page 1844-q years of age.
 III.A.6. PARENT'S EFFORT TO ADJUST CIRCUMSTANCES — § 17a-112(k)(6)
Vicki L. has not maintained adequate contact with Alyssa, nor with the foster parents or DCF regarding the status of her child. The court further finds that Vicki L. is unable to conform her conduct to even minimally acceptable parental standards given the length of her present incarceration. In view of her obligations to the MDOC, giving Vicki L. additional time would not likely bring her performance, as a parent, within acceptable standards in a sufficiently timely manner to make it in the best interests of Alyssa to be reunited with her.
 III.A.7. EXTENT TO WHICH PARENT WAS PREVENTED FROM MAINTAINING A RELATIONSHIP WITH THE CHILD — § 17a-112(k)(7)
No unreasonable conduct by the child protection agency, foster parents or third parties prevented Vicki L. from maintaining relationships with the children at issue in this case, nor did the economic circumstances of the parent prevent such relationships, although the limitations and restrictions inherent in the foster care system were in effect.
 III.B. BEST INTERESTS OF THE CHILD — § 17a-112(j)(2)
In determining whether it would be in Alyssa's best interests to terminate Vicki L.'s parental rights, the court has applied the appropriate legal standards[48] to the facts which are clearly and convincingly apparent in this case. Based on the clear and convincing evidence presented, the court finds this issue in favor of the petitioner.
In deciding whether termination of Vicki L.'s parental rights would be in Alyssa's best interests, the court has examined multiple relevant factors, including the child's interests in sustained growth, development, well-being, stability and continuity of her environment; her length of stay in foster care; the nature of her relationship with her foster parents and biological parent; and the degree of contact maintained with her biological mother.[49] In re Alexander C.,60 Conn.App. 555, 559, 760 A.2d 532 (2000); In re Shyina B.,58 Conn.App. 159, 167, 752 A. 2d 1139 (2000); In re Savanna M., supra,55 Conn.App. 816. The court has also balanced Alyssa's intrinsic CT Page 1844-r need for safety, stability and permanency against the benefits of maintaining a connection with her biological parent. See PamelaB. v. Ment, 244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity).
Under such scrutiny, the clear and convincing evidence in this matter establishes that it is not in Alyssa's best interests to continue to maintain any legal relationship with Vicky L. Although the respondent mother sincerely loves her child, she is simply not available to provide for her toddler's needs today, and she will not be available to fulfill those needs for a significant time into the future, given her obligation to complete her sentence in Massachusetts. Vicky L. wishes to raise her daughter. (Exhibit B.) However, recognizing that she is unable to care for Alyssa at present, Vicki L. would have unspecified third parties help her by taking custody of the child "temporarily." (Exhibit A.) Vicki L's suggestions that others care for Alyssa until her release from prison may fulfill the respondent mother's desires, but this arrangement could not serve the child's fundamental need for a permanent placement that she can call home now, and for the remainder of her childhood. In a case such as this, "[a] parent's love and biological connection . . . is simply not enough" to provide Alyssa with the stability and security she so clearly deserves. (Quotation marks omitted.)In re Ashley S., supra, 61 Conn.App. 667.
Fortunately, Alyssa is doing quite well in her current foster home. She is treated as a member of the family at the home of Ann and her husband; she interacts with her foster parents and foster brother in a comfortable manner. As a two-year-old, Alyssa has an absolute need for reliable, supportive and consistent care, such as that which is available at the home of her foster parents. Her special medical needs require dedicated vigilance and skilled attention, which has thus far been successfully provided by Ann and her husband. See In re Vincent D., supra, 65 Conn.App. 666. Alyssa's attorney, also serving as her GAL, has argued that the child's best interests will be served through granting the TPR petition, so that she can be adopted by her foster family. The court has not received any reliable evidence that contradicts this submission.
Our courts have recognized that "long-term stability is critical to a child's future health and development." In re EdenF., supra, 250 Conn. 709. Furthermore, "[b]ecause of the CT Page 1844-s psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V., 25 Conn.App. 741, 748,596 A.2d 930 (1992); see also In re Juvenile Appeal (84-CD),189 Conn. 276, 292, 455 A.2d 1313 (1983). The court is constrained to agree with Alyssa's attorney who urges the court to find that the child's best interests will be served if the respondent mother's parental rights are terminated, so that she can be freed for adoption.
Having balanced Alyssa's intrinsic need for safety, stability and permanency against the benefits of maintaining a connection with her biological mother Vicki L., the clear and convincing evidence in this case establishes that Alyssa is entitled to the benefit of ending, without further delay, the uncertainty of the issues raised through this litigation. Pamela B. v. Ment,supra, 244 Conn. 313-14. Accordingly, with respect to the best interests of the child contemplated by § 17a-112(j)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Vicki L. is in the best interest of the child Alyssa B.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of this child's sense of time, her need for a secure and permanent environment, the relationship she has with her foster parents, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the child's best interests, the court issues the following ORDERS:
That the parental rights of Vicki L. are hereby terminated as to the child Alyssa B. That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Alyssa B. for the purpose of securing an adoptive family or other permanent placement for her.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law. That primary CT Page 1844-t consideration for adoption of Alyssa B. shall be offered to her current foster parents.
BY THE COURT,
N. Rubinow, J.